### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

Civil Action No. 3:12-cv-01658-JCH

BRISTOL HEIGHTS ASSOCIATES, LLC;

*plaintiff;*

v.

CHICAGO TITLE INSURANCE COMPANY;

*defendant.*

**EXHIBITS TO**

**MEMORANDUM OF LAW
IN SUPPORT OF
MOTION FOR SANCTIONS**

Exhibit A  – Memorandum of Decision ("State Court Judgment") in Chicago Title Ins. Co. v. Bristol Heights Assocs., LLC, Connecticut Superior Court docket no. X02 UWY-CV07-402047 ("State Court Action")

Exhibit B  – Bristol Heights' Answer, Special Defenses, Counterclaim; Answer and Special Defenses to Volpicella Cross-claim; Counter-cross-claim against Volpicella in State Court Action

Exhibit C  – Mutual Release of Claims, Withdrawal in State Court Action, Addendum to Mutual Release, Stipulation

Exhibit D  – Bristol Heights' Complaint in Bristol Heights Assocs., LLC v. Chicago Title Ins. Co., 3:10-cv-00154RNC ("First Federal Court Action")

Exhibit E  – Ruling and Order (Chatigny, J.) in First Federal Court Action

Exhibit F  – Court of Appeals' Order Dismissing Appeal in Bristol Heights Assocs., LLC v. Chicago Title Ins. Co., Case 11-1115

**Chicago Title Ins. Co. v. Bristol Heights Associates, LLC**
Conn. Superior Court Aug. 18, 2011.
2011 WL 4031565  Not Reported in A.3d

2011 WL 4031565
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION.
CHECK COURT RULES BEFORE CITING.

Superior Court of Connecticut,
Judicial District of Waterbury.

CHICAGO TITLE INSURANCE CO.

v.

BRISTOL HEIGHTS ASSOCIATES, LLC et al.
No. X02UWYCV074020477S.

August 18, 2011.

**Memorandum of Decision**

Shaban, J.

# I

## PROCEDURAL HISTORY

The plaintiff, Chicago Title Insurance Company (Chicago Title) has initiated this action seeking a declaratory judgment relative to its obligations under a title insurance policy issued to the defendant Bristol Heights Associates, LLC (BHA) for real property located near Daniel Road and Kingswood Dr. in Bristol, Connecticut ("Property"). The operative complaint is the May 23, 2007 six-count revised complaint (# 105) in which the plaintiff alleges that it is entitled to a declaratory judgment in its favor based upon the following: applicability of express policy exclusions (first and second counts); breach of contract through a failure of BHA to obtain plaintiff's consent prior to the payment of a delinquent tax lien as well its refusal to cooperate in the plaintiff's investigation of a claim (third and fourth counts); a breach of the implied covenant of good faith and fair dealing (fifth count) and conditional indemnification through the defendant Lew J. Volpicella (Volpicella) (sixth count).

In addition to its answer, the defendant BHA filed a three-count counterclaim alleging breach of contract, a breach of the covenant of good faith and fair dealing, as well as a violation of the Connecticut Unfair Trade Practices Act, General Statutes § 42–

[Page 2]

110a et seq. (CUTPA). As to the latter two counts, the court granted the plaintiff's motion for summary judgment (# 212) leaving the breach of contract count as the only remaining counterclaim (# 139). In response to that count, the plaintiff filed six special defenses (# 155) including the failure to mitigate damages, waiver, assumption of the loss, policy exclusion for a loss suffered, created or assumed; policy exclusion for no loss suffered, failure to cooperate and voluntary assumption of liability.

The defendant Volpicella also has filed an answer, special defenses and set-off to the plaintiff's complaint (# 142). His special defenses include equitable estoppel, unclean hands and waiver. In his claim of set-off, Volpicella alleges that if he is found liable to Chicago Title, and Chicago Title is found liable to BHA, he is entitled to a set-off of any sums which might otherwise be due him from an $800,000 promissory note payable to Volpicella from BHA.

On May 23, 2007, the plaintiff received from the court a prejudgment remedy restricting the defendants from transferring or assigning any interest in the promissory note to a third party. The matter was ultimately tried to the court over four days ending on February 8, 2011. The parties have filed post-trial findings of fact and briefs which the court has reviewed.

# II

## FACTS

At all relevant times, plaintiff Chicago Title was a title insurance company with an office in Hartford, Connecticut. The defendant BHA is a Connecticut limited liability company formed on January 21, 2003. Its majority owner is Sentinel Equities Corporation (Sentinel), of which BHA's manager, William Orlandi (Orlandi), was the

[End of First Page of Filed Memorandum of Decision]

[End of Page 2]

**Chicago Title Ins. Co. v. Bristol Heights Associates, LLC**
Conn. Superior Court Aug. 18, 2011
2011 WL 4031565  Not Reported in A.3d

[Page 3]                                                          [Page 4]

sole shareholder. Defendant Volpicella has been a member of BHA since its formation, and has at all times owned a 25% membership interest in BHA.  (Ex. 13.)

On May 25, 1994, Volpicella purchased the Property involved in this action for $225,000 by a quit claim deed from PB Real Estate, Inc.  (Ex. EEE, Ex. 4, 6.)  In connection with that purchase, Volpicella purchased an owner's title insurance policy from Commonwealth Land Title Insurance Co. (Ex. 7.)  At the time of purchase, the Property was a single parcel of land. (Ex. DDD.) It had formerly been subdivided into 147 lots. (Ex. 2, Ex. CCC.) However, the subdivision of the Property had expired on March 3, 1993 as evidenced when the City of Bristol ("City") filed a Notice of Expiration of Subdivision on the land records on April 18, 1994.  (Ex. 2, 5.)  There were no improvements on the land.

The Commonwealth title policy Volpicella purchased contained an exclusion from coverage for the real property taxes on the Grand List of October 1, 1993, that were not yet due and payable as of the closing date of May 26, 1994.  (Ex. 7.)  It is undisputed that the City never sent a bill to Volpicella for the taxes due on the October 1, 1993 Grand List.  As a result, the payments due from Volpicella for the July 1994 and January 1995 installments of that tax bill went unpaid.

On May 31, 1995, the City recorded tax liens for the Grand List of October 1, 1993 under the name of PB Real Estate, Inc., Volpicella's predecessor in title. The liens were filed individually against 147 lots even though the Property was a single parcel effective March 3, 1993.  (E.g., Ex. 8.) The City provided notice of the liens to PB Real Estate, Inc. but not to Volpicella. The City received no response to the notice and took no action on the liens.

For tax lists after the 1993 Grand List, Volpicella paid the taxes on the Property whenever he received a bill and no overdue balance for the 1993 Grand List was reflected on any of the bills he received. In fact, when Volpicella was short $52.57 in his payment of taxes for the January 1, 2001 installment on the 1999 Grand List, he received an action notice reflecting his delinquency on January 19, 2001 and immediately paid the nominal shortage.  (Ex. III, JJJ, KKK.) Despite the statutory obligation to do so under General Statute § 12–144b, the City did not apply any of Volpicella's subsequent tax payments to the oldest, past due balance it claimed was due from the 1993 Grand List.[1]

In 1999, Sentinel, through Orlandi and David Holcroft (Holcroft), approached Volpicella regarding the potential development of the Property as an assisted living facility. Orlandi proposed that he would act as the project manager and would do everything relative to the Property's development. Ultimately, Volpicella agreed to the arrangement. In order to move forward with the project, he agreed to become a member of BHA and to convey the Property to it. This was done by a warranty deed dated April 2, 2003 and recorded May 8, 2003. (Ex. 16.) The deed contained no exception for the tax liens on the 1993 Grand List.  (Ex. 16, Ex. MMM.)

The consideration for the conveyance of the Property was an unsecured promissory note dated April 2, 2003 in the amount of $800,000 due and payable in one year on April 2, 2004. (Ex. 15.) Subsequently, on March 14, 2004, a Memorandum of Understanding between Volpicella and Sentinel Equities Corporation was executed

---

[1] General Statutes § 12–144b states:

Each tax payment made to a municipality for taxes due on any specific property shall be applied by the municipality toward payment of the oldest outstanding tax levied on such property with interest thereon; provided, if there is litigation pending between the municipality and the party liable for the oldest outstanding tax on such property concerning such oldest outstanding tax, such tax payment shall only be applied to the oldest outstanding tax on such property which is not involved in such litigation, provided this section shall not apply to tax payments tendered by third parties pursuant to contract or by operation of law.

[End of Page 3]                                          [End of Page 4]

**Exhibit A**   WestlawNext   © 2012 Thomson Reuters. No claim to original U.S. Government Works.

**Chicago Title Ins. Co. v. Bristol Heights Associates, LLC**
Conn. Superior Court Aug. 18, 2011
2011 WL 4031565  Not Reported in A.3d

[Page 5]                                    [Page 6]

which purported to extend the conditions for the payment of the note. (Ex. 22.) By its terms, the Memorandum required BHA to pay Volpicella on the note only in the event of the receipt of permanent financing or sufficient bridge financing of the project. Notably, BHA was not a signatory to the agreement.

Moreover, in February 2006, BHA borrowed $1,915,000 from Point Center Financial secured by the Property but did not inform Volpicella. (Ex. 47.) In 2007, it borrowed and received over $2,500,000 more from the same lender again without Volpicella's knowledge. To date, Volpicella has not been paid any portion of the note.

At the time of the transfer of the property on April 2, 2003, BHA purchased an owner's title insurance policy ("Policy") from Chicago Title insuring title to the Property. (Ex. 1, Ex. V.) Richard Kuzmak was BHA's attorney for the conveyance from Volpicella to BHA and also served as Chicago Title's issuing agent with respect to the Policy. Kuzmak had represented Sentinel prior to the formation of BHA and had represented BHA from its inception.

In connection with his issuance of the Policy as an agent for Chicago Title, Kuzmak performed a title search. (Ex. 18.) He requested and received authorization from Chicago Title to use Volpicella's Commonwealth title policy (Ex. 7) as a "backer." (Ex. 19.) As a result, Kuzmak did not locate the liens recorded May 31, 1995 because they were filed on subdivided lots against PB Realty, Inc. the prior owner of the property that conveyed it to Volpicella.

BHA received a demand for payment of the 1993 taxes from the City by letter dated August 16, 2005. (Ex. 23, Ex. R.) Following notice of the demand, BHA never notified Volpicella that it was asserting any claim under his warranty deed nor did it

request that he pay the tax liens. That same day, Orlandi, as manager of BHA, spoke to the City's tax collector, Mildred Parks, who told him that the City would allow BHA time to discuss the demands and allow BHA's counsel to become involved in the matter. Parks also told Orlandi that the City would take no immediate action against the proposed development project. (Ex. 62.)

On September 1, 2005, Attorney Kuzmak wrote a letter to attorney Philip Fanning at Chicago Title regarding the receipt of the tax liens and requested an opportunity to discuss a title issue that had arisen.[2] (Ex. 25, Ex. Q.)

Fanning and Kuzmak eventually met on October 27, 2005 at Kuzmak's office. Notes of the meeting kept by Fanning indicated that Kuzmak requested Fanning (Chicago Title) not to do anything about the liens at that moment because the money owed Volpicella under the promissory note exceeded the amount of the tax liens and the validity of the liens were in question. (Ex. 28.) Fanning did not consider the meeting to be relative to a claim under the title policy, but rather understood it to be a discussion of a title issue that had arisen.[3]

Kuzmak also notified James Ziogas, Volpicella's attorney, in connection with the conveyance, and Kuzmak knew the liens "violated a covenant in the warranty deed" and "thought they ought to be put on notice." (Ex. 24.)

Other than Kuzmak's request for a meeting with Fanning, BHA did not ask

---

[2] The full text of the September 1, 2005 letter reads as follows: "Dear Phil: Bristol Heights Associates acquired title to the subject property by deed from Lew J. Volpicella dated April 2, 2003, a copy of which deed is enclosed herein. An Owner's Policy, a copy of which is enclosed, was issued in connection therewith. Recently, I received the enclosed Notice of Tax Liens which date back to the list of 1993. I need to discuss this matter with you to determine how to proceed. You should know that the Grantor, Lew J. Volpicella, is a member of Bristol Heights Associates, LLC and is owed money by the LLC, in an amount substantially more than the amount of these claims, if they are valid. Please let me know when I can come in and discuss this with you. Very truly yours, Richard P. Kuzmak."

[3] In his December 30, 2009 ruling on the motion for summary judgment (# 212), Judge Shortall found that the letter constituted a notice of claim under the Policy.

[End of Page 5]                            [End of Page 6]

**Chicago Title Ins. Co. v. Bristol Heights Associates, LLC**
Conn. Superior Court Aug. 18, 2011
2011 WL 4031565  Not Reported in A.3d

[Page 7]                                                    [Page 8]

Chicago Title to take any action with respect to the tax liens between September 1, 2005, and October 27, 2005. Neither issued any correspondence to the other on the matter between the September 1st letter and their meeting in late October.

Following his meeting with Fanning, Kuzmak met with City officials in the Fall of 2005. After that meeting, Kuzmak expressed his view to Fanning that there were significant issues as to the validity and enforceability of the liens and the assessment underlying the liens. Kuzmak told Fanning not to do anything because BHA had the right to offset the taxes against its note to Volpicella. (Ex. 15, 28.) Kuzmak also stated that he was trying to work out the issue with Volpicella's attorney, James Ziogas, and was "trying to resolve the problem for both Bristol Heights and Chicago Title."

During the Fall of 2005, Kuzmak and others, including Ziogas and BHA's members directly, attempted to resolve or compromise the liens with the City. Kuzmak explained to the city the many questions he and BHA had about the validity of the tax liens, the amount of the tax, and the assessment. Ziogas shared these concerns and sought to reach a negotiated resolution of the liens. These meetings occurred up through November 2005 and were ultimately unsuccessful. (Ex. DD.)

BHA believed that the legitimate tax liability, if any, was for approximately $11,000, based on its estimate of the amount that Volpicella would have owed had the Property been taxed as a single parcel in 1993. (Ex. 62.) As the former tax collector for the City, Mildred Parks credibly testified that had the Property been taxed as a single lot, the 1993 tax would have been $12,265.26 (Ex. XXX.); as 147 lots the tax was $64,060.84. BHA also believed that, due to the covenants of the warranty deed from Volpicella, the tax liability ultimately was his responsibility. (Ex. 24, 27.) However,

BHA never made any demand upon him to make payment of the debt claimed.

From the time of Kuzmak's October 27, 2005 meeting with Fanning to December 23, 2005, neither Kuzmak (nor BHA directly) wrote to Fanning relative to the tax issue. No request was made of Fanning to participate in any meeting or telephone call between BHA or its representatives and the City.

At some point in late 2005, BHA began the process of attempting to refinance the debt relative to the project. Specifically, a mortgage to Sentinel secured by the property was due to be repaid on February 26, 2006. During this period, no information was provided by Kuzmak or BHA to Fanning about a potential refinancing being considered by BHA. Nor was any request made of Chicago Title to issue a new policy to insure over the lien to facilitate the refinance.

On or about December 23, 2005, Kuzmak inquired of Fanning how to obtain acknowledgment of a title claim from Chicago Title. Fanning directed Kuzmak to send a letter to the Chicago Title claims office in New York which Kuzmak did. (Ex. 31.) Chicago Title then acknowledged receipt of a title claim on December 27, 2005 and assigned attorney Norma Levy to investigate the claim. (Ex. 32.) Kuzmak had issued the letter at the direction of Orlandi, who was under the impression that Chicago Title had already received a notice of claim and was refusing to acknowledge it. (Ex. 62.)

In late December 2005 or early January 2006, BHA learned that the City was contemplating foreclosure of the 1993 tax liens. Kuzmak then sent a fax to Fanning and the Chicago Title claims center advising that the City was considering referral of the matter to the corporation counsel for the collection of the tax. (Ex. 33.)

Upon being assigned the matter, Levy immediately investigated whether the tax

[End of Page 7]                                          [End of Page 8]

**Exhibit A**   WestlawNext   © 2012 Thomson Reuters. No claim to original U.S. Government Works.

**Chicago Title Ins. Co. v. Bristol Heights Associates, LLC**
Conn. Superior Court Aug. 18, 2011
2011 WL 4031565  Not Reported in A.3d

[Page 9]                                                    [Page 10]

liens were valid and enforceable and whether there were viable defenses to the City's threatened claims. She also sought to investigate whether the liens were covered under the Policy. She spoke to Kuzmak who then provided Levy with the tax collector's demands, Volpicella's warranty deed, and an e-mail from Ziogas "acknowledging that the taxes are the ultimate responsibility of Lew J. Volpicella by virtue of the covenants of the Warranty Deed." (Ex. 34.)

Levy also asked Kuzmak to perform a legal analysis of the validity of the liens. Kuzmak performed that analysis for the benefit of Chicago Title and BHA and sent Levy his findings on January 19, 2006. (Ex. 36.)  Kuzmak informed Levy that, "if the subdivision became null and void on March 3, 1993, then the property should have been assessed as a tract on October 1, 1993, and, if so, presumably would have produced a substantially smaller amount of tax ." (*Id.*)

From the information available to her, Levy believed there were viable defenses to any action initiated by the City. Specifically, as credibly testified to by Kuzmak, the Property had been assessed as a subdivision even after the subdivision had expired, the City had never notified the then owner, Volpicella, of its intent to file a tax lien in 1995; that Volpicella had paid the current taxes on the property for close to ten years and the City had never applied his payments to the oldest outstanding tax or otherwise indicated an arrearage; that the tax bills for the 1993 Grand List had not been sent to Volpicella; that the liens had been filed outside of the chain of title, and that the certificates of lien had inaccurately described the property as 147 lots as opposed to a single parcel.

While investigating the claim, Levy spoke on several occasions with the City, including twice with the tax collector. From those discussions she was able to obtain

three extensions of the time so that Chicago Title could continue to investigate the claim before the City would refer the matter to outside counsel for the initiation of collection efforts.  (Ex. 42, Ex. A, DD.)  At no time during the discussions in January 2006 did the tax collector state that the City was going to commence a foreclosure action.

BHA was aware in late 2005 and the beginning of 2006 that its existing financing was going to mature on February 26, 2006 but did not notify Chicago Title that it was in the process of refinancing the property. (Ex. 43.)  As of March 8, 2006, the City had neither initiated a foreclosure action nor referred the matter to outside counsel for collection.  Well before that date, Kuzmak had conveyed directly to BHA his concerns about the validity of the liens and the fact that they may not be collectible.  Nonetheless, on that date, BHA paid the tax liens in full.  (Ex. 50.)  It was stipulated at trial that BHA did not notify Chicago Title nor did it obtain Chicago Title's consent prior to paying the tax liens on March 8, 2006.[4]  There was also credible testimony from BHA's David Holcroft that at that time there was no foreclosure action threatened by any existing lender of BHA. He also testified that the purpose of the payment was to facilitate BHA's ability to obtain money to continue work on the project.

Prior to BHA's payment of the taxes, and while investigating the validity of the liens, Levy had sent letters to BHA on January 25 and 26, 2006 requesting information and examinations under oath pursuant to the terms of the Policy.[5]  (Ex. 37, 38.)  BHA's

---

[4] In his ruling on the motion for summary judgment (# 212), Judge Shortall had made the same findings relative to notice and consent.
    Paragraph 9(c) of the Policy conditions and stipulations, entitled "Limitation of Liability," provides that "The Company [Chicago Title] shall not be liable for loss or damage to any insured for liability voluntarily assumed by the insured in settling any claim or suit without the prior written consent of the Company."

[5] Paragraph 5 of the Conditions and Stipulations provides in pertinent part as follows: "[T]he insured claimant may reasonably be required to submit to examination under oath by any authorized representative of the Company and shall produce for examination, inspection and copying, at such reasonable times and [*continued*]

[End of Page 9]                                              [End of Page 10]

**Exhibit A**     <span>WestlawNext</span>     © 2012 Thomson Reuters. No claim to original U.S. Government Works.

**Chicago Title Ins. Co. v. Bristol Heights Associates, LLC**
Conn. Superior Court Aug. 18, 2011
2011 WL 4031565  Not Reported in A.3d

[Page 11]

response to Levy's requests for information came from Orlandi in the form of two voice mail messages refusing to cooperate and threatening a lawsuit against Chicago Title. BHA also threatened to file a complaint to the Connecticut Insurance Department, in addition to the one BHA had already filed.[6] In response to the messages, Levy wrote to Orlandi on January 30, 2006, explaining further the reasons for Chicago Title's requests for documentation, and the basis in the Policy for her requests. The letter made clear that refusal to cooperate was grounds under the Policy for denying coverage of BHA's claim. (Ex. 39.) Levy and Orlandi then spoke on the telephone during the next week and Orlandi again refused to cooperate or to provide the documents that Chicago Title requested for its coverage investigation. Orlandi had no further phone conversations with Levy or Chicago Title about the liens after the first week of February 2006.

BHA did not respond further to Chicago Title's letters of January 25, 26, and 30, 2006, requesting documents, until February 23, 2006.  At that time, Orlandi wrote on behalf of BHA that Chicago Title's request for documents and examinations "is hereby denied, in kind." (Ex. 46.) Orlandi further ordered that all correspondence regarding the matter should be referred to "our corporate counsel, Donald Conn." (*Id.*)

[Page 12]

Levy phoned attorney Conn on February 28, 2006 to request verification that the taxes were paid by BHA. He indicated he was not sure and would get back to her, but never did.

The day after Orlandi's February 23, 2006 letter, BHA closed on the refinancing that it had worked to acquire through Point Center Financial.[7] That closing included the issuance of a check payable to the City, in the full amount of its claim for taxes, penalties and interest dating back to 1993, which was $200,341.34. (Ex. 45, 47.)  The check was received by the City on March 8, 2006.  Prior to payment, BHA never asked Volpicella or Chicago Title for permission to do so. Though he did not believe the taxes should be paid, Volpicella had suggested to BHA that the City's claim could be handled by offsetting any amounts that were owed him from the promissory note issued by BHA. However, BHA claimed that it was required to pay the taxes pursuant to a written commitment issued by its refinancing lender. Holcroft testified that BHA paid the taxes to advance its business plan and to ensure that the new lender, Point Center Financial, had clear title to facilitate its financing.

At the time it issued its check, BHA paid the taxes "under protest" stating that:

> Bristol Heights disputes that the past due taxes and Interest in the amount of $200,341.31 are rightfully due and payable.... [A]lthough Bristol Heights is paying the full amount of $200,341.31 by the attorney's client fund check enclosed herein, it is doing so only under protest. Bristol Heights reserves any and all rights that it may have against the City of Bristol to recover these taxes and/or interest in an appropriate future proceeding.

(Ex. 50, Ex. F.)  BHA did not provide Chicago Title or Volpicella with a copy of its letter or the check.  It is undisputed that following the issuance of the check neither BHA nor Chicago Title took any action to challenge the taxes paid "under protest."

---

places as may be designated by any authorized representative of the Company, all records, books, ledgers, checks, correspondence and memoranda, whether bearing a date before or after Date of Policy, which reasonably pertain to the loss or damage. Further, if requested by any authorized representative of the Company, the insured claimant shall grant its permission, in writing, for any authorized representative of the Company to examine, inspect and copy all records, books, ledgers, checks, correspondence and memoranda in the custody or control of a third party, which reasonably pertain to the loss or damage. Failure of the insured claimant to submit for examination under oath, produce other reasonably request information or grant permission to secure reasonably necessary information from third parties as required in this paragraph shall terminate any liability of the Company under this policy as to that claim."

[6] Shortly after Chicago Title had acknowledged notice of BHA's claim set out in Kuzmak's December 23, 2005 letter, BHA filed a complaint on January 3, 2006 with the Connecticut Insurance Department, alleging that Chicago Title was not sufficiently responsive. Chicago Title responded to the complaint on February 3, 2006, noting that it had only received the claim by letter dated December 23, 2005.  It also contended that, to that point, BHA was refusing to cooperate, and that Chicago Title had taken steps to protect its insured's interests by obtaining extensions of time from the City to address the claim.  (Ex. 35, 42.)

---

[7] There was conflicting testimony on whether Chicago Title had been informed of BHA's refinance efforts. The court finds the greater weight of the evidence to establish that Chicago Title was not told of the refinance and that it did not learn of the tax payment until several weeks after the fact.

[End of Page 11]

[End of Page 12]

WestlawNext   © 2012 Thomson Reuters. No claim to original U.S. Government Works.

**Chicago Title Ins. Co. v. Bristol Heights Associates, LLC**
Conn. Superior Court Aug. 18, 2011
2011 WL 4031565  Not Reported in A.3d

[Page 13]

Even after BHA paid the taxes in full on March 8, 2006, it continued to refuse to provide the documents Chicago Title had requested.  By April 24, 2006 BHA threatened litigation against Chicago Title through its newly retained outside counsel while proclaiming that it remained available to provide any and all information relative to the resolution of the claim.  (Ex. 53.)  On June 19, 2006, BHA initiated arbitration on the enforcement of the terms of the Policy.  On July 21, 2006, Orlandi and Volpicella submitted to examinations under oath and thereafter produced certain documents Chicago Title had been requesting since January 2006.  (Ex. B, QQ, Ex. 62.)  On November 6, 2006, BHA withdrew from the arbitration proceedings which had been scheduled for a hearing on November 21, 2006.  (Ex. 59, 60, 61.)  During this time, Orlandi continued to instruct Volpicella and the other members of BHA that all matters relative to the investigation be done through him as manager of BHA.  (Ex. OOO, Ex. 62.)

Because of BHA's actions, Chicago Title never completed its coverage investigation.  In fact, it was stipulated at trial that BHA did not cooperate with Chicago Title's coverage investigation prior to paying the City in full on March 8, 2006.[8]  Based on the above, the court finds that it also failed to cooperate relative to the arbitration action.

---

[8] In his summary judgment memorandum of decision dated December 30, 2009, (# 212.00), Judge Shortall also found that BHA had refused to cooperate in Chicago Title's investigation of the claim.

Paragraph 4(d) of the Conditions and Stipulations of the policy provides in relevant part as follows: "In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding, the insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, and all appeals therein, and permit the Company to use, at its option, the name of the insured for this purpose. Whenever requested by the Company, the insured, at the Company's expense, shall give the Company all reasonable aid (i) in any action or proceeding securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement and (ii) in any other lawful act which in the opinion of the Company may be necessary or desirable to establish the title to the estate or interest as insured. If the Company is prejudiced by the failure of the insured to furnish the required cooperation, the Company's obligations to the insured under the policy shall terminate, including any liability or obligation to defend, prosecute, or continue any liability or obligation to defend, prosecute, or continue any litigation, with regard to the matter or matters required such cooperation."

[End of Page 13]

[Page 14]

Other facts will be recited as necessary.

# III

# THE PLAINTIFF'S COMPLAINT

Plaintiff's complaint seeks relief through a declaratory judgment as to each of its six counts. In general the plaintiff seeks a determination of its obligations under the Policy given the conflicting views of the parties thereon.  As noted by our Supreme Court, "[t]he purpose of a declaratory judgment action ... is to secure an adjudication of rights where there is a substantial question in dispute or a substantial uncertainty of legal relations between the parties ... and to make certain that the declaration will conclusively settle the whole controversy."  (Citations omitted; internal quotation marks omitted.)  *Mannweiler v. LaFlamme,* 232 Conn. 27, 33, 653 A.2d 168 (1995).  "[It] is a special proceeding under General Statutes § 52–29, implemented by Practice Book §§ 17–54 and 17–55."  *ACMAT Corp. v. Greater New York Mutual Ins. Co.,* 88 Conn.App. 471, 475, 869 A.2d 1254, cert. denied, 274 Conn. 903, 876 A.2d 11 (2005).  Declaratory judgment "provides a valuable tool by which litigants may resolve uncertainty of legal obligations ... The [declaratory judgment] procedure has the distinct advantage of affording to the court in granting any relief consequential to its determination of rights the opportunity of tailoring that relief to the particular circumstances."  (Citations omitted; internal quotation marks omitted.)  *Milford Power Co. v. Alstom Power, Inc.,* 263 Conn. 616, 625, 822 A.2d 196 (2003).

"[W]hile the declaratory judgment procedure may not be utilized merely to secure advice on the law ... or to establish abstract principles of law ... or to secure the construction of a statute if the effect of that construction will not affect a plaintiff's

[End of Page 14]

**Chicago Title Ins. Co. v. Bristol Heights Associates, LLC**
Conn. Superior Court Aug. 18, 2011
2011 WL 4031565  Not Reported in A.3d

[Page 15]                                    [Page 16]

personal rights ... it may be employed in a justiciable controversy where the interests are adverse, where there is an actual bona fide and substantial question or issue in dispute or substantial uncertainty of legal relations which requires settlement, and where all persons having an interest in the subject matter of the complaint are parties to the action or have reasonable notice thereof. Practice Book § [17–55]." *Liberty Mutual Ins. Co. v. Lone Star Industries, Inc.,* 290 Conn. 767, 813, 967 A.2d 1 (2009).[9]

Here, all persons or legal entities with an interest in the subject matter of the complaint are parties to the action and so the court can address the requested relief.

### A.

In its first count the plaintiff seeks a declaratory judgment that BHA's coverage is precluded by paragraph 3(a) of the Policy due to BHA's prior knowledge of the tax liens at the time it took title to the property. It argues that BHA either had actual knowledge of the liens, or that such knowledge was imputed to it by Volpicella who was aware of the tax debt at the time he became a member of BHA.

Paragraph 3(a) of the Policy states that coverage is excluded for any loss or damage that "arise by reason of ... [d]efects, liens, encumbrances, adverse claims or other matters: (a) created, suffered, assumed or agreed to by the insured claimant." Under the facts set forth above, there is insufficient evidence to establish that BHA had actual knowledge of the tax debt at the time it acquired the Property by warranty deed

from Volpicella on April 2, 2003. There is also insufficient evidence to establish that such knowledge was imputed to BHA by Volpicella simply by virtue of his becoming a member of the company at that time. Volpicella was unaware of not only the debt, but also of the lien which was not filed until May 31, 2005. The lien was filed under the name of PB Real Estate, Inc. and a copy of the lien was not forwarded to BHA's attention until August 16, 2005. Hence, neither was aware the October 1, 1993 Grand List tax obligation was overdue at any time they owned the property until then. As such, the debt could not have been within their prior knowledge or imputed from one to the other.

Accordingly, judgment shall enter in favor of BHA as to the first count.

### B.

As to the second count, the plaintiff seeks a declaratory judgment that BHA's coverage is precluded by paragraph 3(c) of the Policy which excludes coverage for any title defect that "result[s] in no loss or damage to the insured claimant." It claims that BHA suffered no loss by paying the taxes to the City owed by Volpicella at a time when it owed Volpicella $800,000 on the promissory note. In effect, it could set-off its debt to Volpicella by the amount paid to the City.

Based on the facts set forth above the court finds that such claim is not sustainable as no formal claim for set-off has been made by Bristol Heights. Absent such a request for relief, the set-off is speculative and therefore cannot form the basis for exclusion from coverage under the Policy. Moreover, the Memorandum of Understanding executed by Volpicella, which effectively amended the terms for the payment of the note, conditioned its payment by BHA upon the receipt of permanent financing or sufficient bridge financing for the project. There is nothing in the record to establish that such financing

---

[9] Practice Book § 17–55 states: "A declaratory judgment action may be maintained if all of the following conditions have been met: (1) The party seeking the declaratory judgment has an interest, legal or equitable, by reason of danger of loss or of uncertainty as to the party's rights or other jural relations; (2) There is an actual bona fide and substantial question or issue in dispute or substantial uncertainty of legal relations which requires settlement between the parties; and (3) In the event that there is another form of proceeding that can provide the party seeking the declaratory judgment immediate redress, the court is of the opinion that such party should be allowed to proceed with the claim for declaratory judgment despite the existence of such alternate procedure."

[End of Page 15]                              [End of Page 16]

**Exhibit A**   WestlawNext   © 2012 Thomson Reuters. No claim to original U.S. Government Works.

**Chicago Title Ins. Co. v. Bristol Heights Associates, LLC**
Conn. Superior Court Aug. 18, 2011
2011 WL 4031565  Not Reported in A.3d

[Page 17]                                              [Page 18]

was ever received.  Arguably then, the note is not yet due and payable and therefore the tax payment could not be set off against it.

Accordingly, judgment shall enter in favor of BHA as to the second count.

## C.

In the third count of its complaint, the plaintiff seeks a declaratory judgment that BHA's voluntary payment of the taxes excludes coverage under the Policy.  The language of paragraph 9(c) of the Policy is set forth in footnote 4 above.  As noted previously, it was stipulated at trial that BHA did not request or obtain the plaintiff's consent before paying the taxes in full.  The evidence clearly established that the election of BHA to make payment was not based upon the fear of losing title to the Property, but rather, to conclude a refinance so as to forward its business expectations.  This was a voluntary act and choice on the part of BHA.  This is particularly so in the context of the purpose of the Policy (to protect the insured's title from claims adverse to it) when the evidence established that there was no pending claim of foreclosure against the Property at that time.  Although the debt had been pursued by the filing of the tax liens against the Property, and the tax collector had warned of impending potential collection actions, at the time of payment there was no evidence that the City had yet referred the matter to counsel for collection.  In fact extensions had been granted by the City to allow BHA and Chicago Title to address the liens.  Coupled with BHA's resistance to cooperating with Chicago Title's investigation, which compounded the very problem BHA complained of (plaintiff's lack of speed in timely addressing the liens), the evidence is clear that the payment by BHA was done voluntarily through its own affirmative act and without the impetus of a pending loss of title.

Although it has been stipulated that BHA did not obtain plaintiff's consent prior to making payment, that alone does not excuse the plaintiff from its obligations under the Policy.  There must be a showing that BHA's actions were prejudicial to the plaintiff.  *Taricani v. Nationwide Mutual Insurance Co.,* 77 Conn.App. 139, 148–49, 822 A.2d 341 (2003) (citing *Aetna Cas. & Surety Co. v. Murphy,* 206 Conn. 409, 415–16, 538 A.2d 219 (1988)).  By making the payment, BHA did materially prejudice the plaintiff's ability to meet its obligations under the terms of the Policy.  For example, the plaintiff could have challenged the failure of the City to apply the payments of BHA and/or Volpicella in accordance with General Statutes § 12–144b.  Also, the plaintiff lost the opportunity to challenge the validity of the liens that were filed by the tax collector on the grounds that they had not been sent to the owner of record (they had been sent to PB Realty, Inc. rather than Volpicella) and that they failed to properly describe the Property (a single parcel vs. 147 separate lots).  The payment also evaporated any ability of the plaintiff to negotiate with the City as to the amount due under the lien. Based on the evidence, there was a real possibility that the City had made an error in the description of the Property and might have conceded to such and adopted the position that the Property should have been liened as a single parcel thereby reducing the overall tax obligation.  Other challenges may have been available to the plaintiff in addressing the liens which could have led to the ability to negotiate from a position of strength as to the amounts due, but such ability was lost upon payment.

The court finds that under the circumstances of this case, BHA's actions breached the terms of paragraph 9(c) of the Policy and thereby terminated the plaintiff's obligations under it.  *Brown v. Employers' Reinsurance Corp.,* 206 Conn. 668, 675, 539

[End of Page 17]                                      [End of Page 18]

WestlawNext   © 2012 Thomson Reuters. No claim to original U.S. Government Works.

**Chicago Title Ins. Co. v. Bristol Heights Associates, LLC**
Conn. Superior Court Aug. 18, 2011
2011 WL 4031565   Not Reported in A.3d

[Page 19]                                    [Page 20]

A.2d 138 (1988). Such breach resulted in prejudice to the plaintiff's ability to determine whether coverage applied and to prevent loss or damage to BHA. Plaintiff is therefore not liable for any loss or damage suffered by BHA through such payment. Accordingly, coverage is excluded under the Policy and judgment shall enter for the plaintiff on the third count.

### D.

The fourth count of plaintiff's complaint seeks a declaratory judgment that the plaintiff's obligations under paragraph 4(d)(ii) and paragraph 5 of the Policy are terminated through BHA's breach of its duty to cooperate.[10]  As noted above, it was stipulated between the parties that BHA did not cooperate in Chicago Title's coverage investigation of the City's claims.

Although it has stipulated to its failure to cooperate, BHA contends in its post-trial brief that such failure does not implicate paragraphs 4(d)(ii) and 5 as such breach was excused by Chicago Title's prior breach in failing to provide coverage for BHA's claim under the Policy.  For reasons set forth above and in Section IV below, the court finds that Chicago Title did not breach the contract.

This however, is not dispositive of the issue as BHA also argues that the plain language of paragraph 4(d) of the Policy limits its duty to cooperate to the context of matters in litigation and that the City's liens did not constitute such matters. BHA's argument is well founded. The heading of Section 4 of the Policy is entitled "Defense and Prosecution of Actions; Duty of Insured Claimant to Cooperate." The language of a duty to cooperate in Section 4(d) must be viewed in the context of the language of Section 4(a) which states in relevant part that Chicago Title "shall provide for the defense of an deed

insured in *litigation* in which any third party asserts a claim adverse to the title or interest as insured, but only to those stated causes of action alleging a defect, lien or encumbrance or other matter insured by this policy." (Emphasis added.) That language clearly reflects action brought about through litigation rather than a demand for payment. As the evidence has shown, there was no pending litigation to collect the debt at the time of BHA's payment to the City or thereafter. Hence, BHA's failure to cooperate does not run afoul of Section 4(d)(ii) as the language of that section is also preceded by references to the prosecution or defense of an action, or proceeding, or all appeals therefrom.  See Section 4, 4(d)(i).

However,   BHA's   argument   that   its refusal to cooperate does not violate the provisions of Section 5 is unavailing.   The language of that section, entitled "Proof of Loss or Damage" states that the insured "may reasonably be required to submit to examination under oath by any authorized representative of the Company and shall produce for examination, inspection and copying, at such reasonable times and places ... all records, books, ledgers, checks, correspondence, and memoranda, ... which reasonably pertain to the loss or damage....  Failure of the insured claimant to submit for examination under oath, produce other reasonably requested information or grant permission to secure reasonably necessary information from third parties as required in this paragraph shall terminate any liability of the Company under this policy as to that claim."  The evidence has established that on January 25, and 26, 2006 Chicago Title made multiple reasonable requests to have BHA members or its manager submit to examinations under oath and produce documents but that BHA refused such requests more than once. (Ex. 37, 38.)  In response to the refusal, Chicago Title wrote to BHA

---

[10] See footnotes 5 and 8 above.

[End of Page 19]                              [End of Page 20]

**Exhibit A**   WestlawNext   © 2012 Thomson Reuters. No claim to original U.S. Government Works.

**Chicago Title Ins. Co. v. Bristol Heights Associates, LLC**
Conn. Superior Court Aug. 18, 2011
2011 WL 4031565  Not Reported in A.3d

[Page 21]                                               [Page 22]

again on January 30, 2006, explaining further the reasons for Chicago Title's requests for documentation, and the basis in the Policy for its requests. The letter put BHA on notice as of that time that the refusal to cooperate was grounds under the Policy for denying coverage of BHA's claim. (Ex. 39.) The following week, Orlandi, as manager of BHA, called Chicago Title and again refused to cooperate or to provide the documents that Chicago Title requested for its coverage investigation.

Eventually, in late July 2006, Orlandi and Volpicella submitted to examinations under oath and produced certain documents Chicago Title had been requesting since January 2006. (Ex. B, QQ, Ex. 62.) However, their submission to examination and production of documents was so long after the payment of the taxes by BHA that it prejudiced Chicago Title's ability to investigate and defend the claim.

By the Policy's own terms, the failure to submit to an examination under oath and produce documents reasonably requested "*shall* terminate liability of the Company under this policy as to that claim." (Section 5, emphasis added.) The court finds that under the circumstances of this case, BHA's actions breached the terms of paragraph 5 of the Policy and thereby terminated the plaintiff's obligations under it. *Brown v. Employers' Reinsurance Corp.,* 206 Conn. 668, 675 (1988). Such breach resulted in prejudice to the plaintiff's ability to determine whether coverage applied and to prevent loss or damage to BHA. Plaintiff is therefore not liable for any loss or damage suffered by BHA through its payment of the tax liens. Accordingly, coverage is excluded under the Policy and judgment shall enter for the plaintiff on the fourth count.

**E.**

In the fifth count of its complaint, the plaintiff has alleged that BHA's actions

breached the implied duty of good faith and fair dealing inherent in the parties' contractual relationship.

"[I]t is axiomatic that the ... duty of good faith and fair dealing is a covenant implied into a contract or a contractual relationship.... In other words, every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." *Renaissance Management Co. v. Connecticut Housing Finance Authority,* 281 Conn. 227, 240, 915 A.2d 290 (2007). "Essentially, it is a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended. The principle, therefore, cannot be applied to achieve a result contrary to the clearly expressed terms of a contract, unless, possibly, those terms are contrary to public policy." (Internal quotation marks omitted.) *LaSalle National Bank v. Freshfield Meadows, LLC,* 69 Conn.App. 824, 834, 798 A.2d 445 (2002).

"To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." (Internal quotation marks omitted.) *Renaissance Management Co. v. Connecticut Housing Finance Authority, supra,* 281 Conn. at 240. Bad faith involves "actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." (Internal quotation marks omitted.) *New England Custom Concrete, LLC v. Carbone,* 102 Conn .App. 652, 661, 927 A.2d 333 (2007). "Bad faith means more than mere negligence; it

[End of Page 21]                                        [End of Page 22]

**Chicago Title Ins. Co. v. Bristol Heights Associates, LLC**
Conn. Superior Court Aug. 18, 2011
2011 WL 4031565  Not Reported in A.3d

[Page 23]

[Page 24]

involves a dishonest purpose." (Internal quotation marks omitted.)  *Collins v. Anthem Health Plans, Inc.,* 275 Conn. 309, 334, 880 A.2d 106 (2005); see also *Sullivan v. Allstate Ins. Co.,* Superior Court, judicial district of Hartford, Docket No. CV 05 4008548 (March 28, 2006, Tanzer, J.) (bad faith "contemplates a state of mind affirmatively operating with furtive design or ill will.").  "[B]ad faith may be overt or may consist of inaction, and it may include evasion of the spirit of the bargain."  (Citations omitted; internal quotation marks omitted.) *Landry v. Spitz,* 102 Conn.App. 34, 43, 925 A.2d 334 (2007).

In this instance, the court cannot say there is sufficient evidence to conclude that the actions of BHA were done dishonestly, with ill will or a sinister motive. For example, BHA had concerns, whether well founded or not, with whether Chicago Title was actively addressing the tax liens against the Property.  Also, from its perspective, it was wary of some of the requests for examination and the production of documents in that it felt that they were designed more to maximize the ability of Chicago Title to find an exclusion applicable to the claim than to determine its validity.  The simple refusal to submit to examination or produce documents, alone, does not constitute bad faith.  Even BHA's initiating the arbitration and then subsequently withdrawing therefrom, does not under the evidence presented to the court rise to the level of bad faith as set out in our case law.

In sum, there is insufficient evidence to conclude that BHA had exercised bad faith in its dealings with the plaintiff and therefore judgment shall enter in favor of BHA as to the fifth count.

### F.

Under the sixth count, plaintiff seeks a declaratory judgment that if it is found liable to indemnify BHA under the terms of the Policy, Volpicella should be required to indemnify the plaintiff for the amount of any loss paid by plaintiff to BHA.

Based on the facts set forth above, and for the reasons set forth above and below, the court does not find any liability on the part of the plaintiff to indemnify BHA under the Policy.  Therefore, it need not address the claim raised under this count or the special defenses and set-off claim raised against it by the defendant Volpicella.

### IV

### DEFENDANT'S COUNTERCLAIM

In its counterclaim, BHA contends that the plaintiff breached the terms of the title insurance policy by not defending the City's claim for taxes, unreasonably delaying its investigation of the claim, and by failing to pay or settle the claim.  It argues against any liability on its part as it contends that any breach by the plaintiff was committed prior to any breach of the Policy that may have been committed by BHA. Generally, "[t]he elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." (Internal quotation marks omitted.) *Chiulli v. Zola,* 97 Conn.App. 699, 706–07, 905 A.2d 1236 (2006).  Beyond this "[i]t is a general rule of contract law that a total breach of the contract by one party relieves the injured party of any further duty to perform further obligations under the contract." *Shah v. Cover–It, Inc.,* 86 Conn.App. 71, 75, 589 A.2d 959 (2004).

[End of Page 23]

[End of Page 24]

**Exhibit A**   *WestlawNext*   © 2012 Thomson Reuters. No claim to original U.S. Government Works.

**Chicago Title Ins. Co. v. Bristol Heights Associates, LLC**
Conn. Superior Court Aug. 18, 2011
2011 WL 4031565  Not Reported in A.3d

[Page 25]                                             [Page 26]

As noted above, the parties stipulated during the trial that BHA failed to cooperate with Chicago Title's coverage investigation prior to paying the City's tax claim in full on March 8, 2006, and, that it neither notified Chicago Title nor obtained its consent prior to doing so. The court finds that based on those stipulations and the facts set forth above, BHA did breach the terms of the Policy, specifically paragraph 5 (submission to examination under oath at reasonable times and places; production of documents), and paragraph 9(c) (voluntarily settling claim without prior written consent of plaintiff). It further finds that Chicago Title did not breach the terms of the Policy. Even assuming the September 1, 2005 letter from Kuzmak to Fanning constituted notice of the claim to Chicago Title, the plaintiff did what it was asked to do by the defendant. As counsel for BHA, Kuzmak asked that Chicago Title not do anything until Kuzmak had looked into the City's claim further.[11] Upon BHA's request for a formal acknowledgement of the claim in late December 2005, Chicago Title immediately acted to investigate. In effect, between September 1, 2005 and through the early part of 2006, the plaintiff complied with BHA's wishes as relayed through its counsel. Moreover, at the time BHA voluntarily elected to pay the taxes, no litigation had been brought by the City to foreclose on the Property. There was therefore no imminent danger to BHA that it would lose title to the Property. The payment of the taxes was made not to protect its interest in title to the Property, but rather to refinance the company's debt and further its business purpose. Plaintiff therefore had no obligation compelling it to immediately defend the claim by paying the debt. *Thurlow v. TICOR Title Insurance Co.,* Superior Court, judicial

district of Windham at Putnam, Docket No. CV08 5002923 S (July 7, 2009, Riley, J .); 11 G. Couch, Insurance (3rd Ed.1998) § 159:8; § 159.9.

The defendant has failed to establish by a preponderance of the evidence the allegations of breach of contract in its counterclaim. In light of this finding the court need not address the special defenses raised by the plaintiff and the defendant Volpicella relative to the counterclaim.

## V

## CONCLUSION

Judgment may enter in favor of the plaintiff as to counts three and four of the plaintiff's complaint as against the defendant BHA. Judgment may enter in favor of the defendant BHA as to counts one, two and five of that complaint. Judgment may enter in favor of the plaintiff as to the defendant BHA's counterclaim.

As to the sixth count of plaintiff's complaint, in light of the court's ruling on the other counts, no ruling is needed as to the claim or the defendant Volpicella's special defenses and claim of set-off thereto.

So ordered.

**End of Document**

© 2012 Thomson Reuters. No claim to original U.S. Government Works.

---

[10] Kuzmak acknowledged that he was also acting on behalf of Chicago Title at this point by virtue of his having issued the Policy as an agent for plaintiff. In that he was investigating the matter and "trying to resolve the problem for both Bristol Heights and Chicago Title" (Ex. 28), it could be said that as the plaintiff's agent his work was actually in furtherance of the obligations of the plaintiff under the terms of the Policy.

[End of Page 25]

Docket No.: UWY-CV-07-4020477-S (X02)

| | |
|---|---|
| CHICAGO TITLE INSURANCE CO.,    ) | |
|        ) | |
|        ) | |
|    Plaintiff,    ) | |
|        ) | SUPERIOR COURT |
|     vs.    ) | |
|        ) | WATERBURY COMPLEX |
| BRISTOL HEIGHTS ASSOCIATES, LLC and  ) | LITIGATION DOCKET |
| LEW VOLPICELLA ,    ) | |
|        ) | |
|    Defendants.    ) | |
|        ) | September 21, 2009 |

## BRISTOL HEIGHTS ASSOCIATES ANSWER, SPECIAL DEFENSES AND COUNTERCLAIMS TO CHICAGO TITLE INS. CO.; and ANSWER, SPECIAL DEFENSES AND COUNTER-CROSS-CLAIMS TO LEW VOLPICELLA

### Answer to Chicago Title Ins. Co.'s Claims

1.     Admitted, on information and belief.

2.     Admitted.

3.     Admitted.

4.     Admitted.

5.     Admitted.

6.     It is admitted that Volpicella is a member of Bristol Heights holding a 25% interest therein.  Bristol Heights has insufficient knowledge to admit or deny the remaining allegations of Paragraph 6 and leaves the plaintiff to its proof.

7.     Bristol Heights has insufficient knowledge to admit or deny the allegations of Paragraph 7 and leaves the plaintiff to its proof.

8.     Admitted, on information and belief.

9.     Bristol Heights has insufficient knowledge to admit or deny the allegations of Paragraph 9 and leaves the plaintiff to its proof.

**Exhibit B**

10.     Bristol Heights has insufficient knowledge to admit or deny the allegations of Paragraph 10 and leaves the plaintiff to its proof.

11.     Bristol Heights has insufficient knowledge to admit or deny the allegations of Paragraph 11 and leaves the plaintiff to its proof.

12.     Bristol Heights has insufficient knowledge to admit or deny the allegations of Paragraph 12 and leaves the plaintiff to its proof.

13.     Bristol Heights has insufficient knowledge to admit or deny the allegations of Paragraph 13 and leaves the plaintiff to its proof.

14.     Admitted.

15.     Admitted.

16.     Admitted.

17.     Admitted.

18.     It is admitted that the April 2, 2003 Warranty Deed represents that the Property "is free from all encumbrances whatsoever." Bristol Heights has insufficient knowledge to admit or deny the remaining allegations of Paragraph 18 and leaves the plaintiff to its proof.

19.     Admitted.

20.     It is admitted that on Sept. 1, 2005, Attorney Richard Kuzmak, counsel for Bristol Heights, sent notice of claim to Chicago Title at Chicago Title's of the Town's demand for payment of the taxes (the "Notice of Claim"). It is admitted that Bristol Heights had discussions with the Town regarding the Town's demand for payment of the taxes. Bristol Heights has insufficient knowledge to admit or deny the allegations of Paragraph 20 and leaves the plaintiff to its proof.

**Exhibit B**

21.     It is admitted that on Dec. 23, 2005 Attorney Richard Kuzmak, counsel for Bristol Heights sent a one page facsimile to Attorney Earl Mitchell of Chicago Title, which states, *inter alia:* "In September of this year, a claim was made by the City of Bristol for old unpaid tax liens.  At that time, I sent copies of the voluminous package to Phil Fanning in Hartford to put him on notice of a claim, therefore, on behalf of Bristol Heights Associates".  It is further admitted that the Dec. 23, 2005 facsimile states: "I know that you don't have all the detailed information, but I would appreciate at least an acknowledgement of the claim at your earliest convenience."  Bristol Heights has insufficient knowledge to admit or deny the remaining allegations of Paragraph 21 and leaves the plaintiff to its proof.

22.     It is denied that the Dec. 23, 2005 facsimile from Richard Kuzmak, counsel for Bristol Heights to Attorney Earl Mitchell of Chicago Title, constituted the notice of claim;  it is further denied that the Notice of Claim was "technically invalid since it was not sent to the Chicago Title home office in Illinois."  It is admitted that Chicago Title acknowledged the claim on or about Dec. 27, 2005.  Bristol Heights has insufficient knowledge to admit or deny the remaining allegations of Paragraph 22 and leaves the plaintiff to its proof.

23.     Bristol Heights has insufficient knowledge to admit or deny the allegations of Paragraph 23 and leaves the plaintiff to its proof.

24.     Bristol Heights has insufficient knowledge to admit or deny the allegations of Paragraph 24 and leaves the plaintiff to its proof.

25.     Bristol Heights has insufficient knowledge to admit or deny the allegations of Paragraph 25 and leaves the plaintiff to its proof.

3

**Exhibit B**

26.     Bristol Heights has insufficient knowledge to admit or deny the allegations of Paragraph 26 and leaves the plaintiff to its proof.

27.     It is admitted that on Feb. 23, 2006, William Orlandi, on behalf of Bristol Heights, sent a letter to Attorney Norma Levy, counsel for Chicago Title, denying requests for certain unnecessary documents requested by Chicago Title in letters from Chicago Title dated Jan. 25 and Jan. 26, 2006. The remainder of Paragraph 27 is denied.

28.     It is admitted that on March 8, 2006, Bristol Heights issued payment to the Town of Bristol in the amount of $200,341.31. Bristol Heights has insufficient knowledge to admit or deny the remaining allegations of Paragraph 28 and leaves the plaintiff to its proof.

29.     It is admitted that Bristol Heights denied Chicago Title's request for unnecessary documents on more than one occasion. Bristol Heights has insufficient knowledge to admit or deny the remaining allegations of Paragraph 29 and leaves the plaintiff to its proof.

30.     It is admitted that Bristol Heights made demand for arbitration with the American Arbitration Association regarding the Notice of Claim. Bristol Heights has insufficient knowledge to admit or deny the remaining allegations of Paragraph 30 and leaves the plaintiff to its proof.

31.     It is admitted that Chicago Title took examinations of William Orlandi and Lew Volpicella under oath on July 21, 2006. Bristol Heights has insufficient knowledge to admit or deny the remaining allegations of Paragraph 31 and leaves the plaintiff to its proof.

32.     Admitted.

**Exhibit B**

33. It is admitted that Bristol Heights withdrew from the Arbitration.  Bristol Heights has insufficient knowledge to admit or deny the remaining allegations of Paragraph 33 and leaves the plaintiff to its proof.

34. Bristol Heights has insufficient knowledge to admit or deny the allegations of Paragraph 34 and leaves the plaintiff to its proof.

35. Denied

36. Denied

**FIRST CAUSE OF ACTION (Exclusion from Coverage)**

37. Bristol Heights repeats and alleges its answers to the foregoing allegations as if fully set forth herein.

38. Admitted.

39. Denied.

**SECOND CAUSE OF ACTION (Exclusion from Coverage)**

40. Bristol Heights repeats and alleges its answers to the foregoing allegations as if fully set forth herein.

41. Admitted.

42. Denied.

43. Denied.

**THIRD CAUSE OF ACTION (Denial of Coverage)**

44. Bristol Heights repeats and alleges its answers to the foregoing allegations as if fully set forth herein.

45. Admitted.

**Exhibit B**

46.     It is admitted that on March 8, 2006, Bristol Heights issued payment to the Town of Bristol in the amount of $200,341.31.  Bristol Heights has insufficient knowledge to admit or deny the remaining allegations of Paragraph 46 and leaves the plaintiff to its proof.

47.     It is admitted that on March 8, 2006, Bristol Heights issued payment to the Town of Bristol in the amount of $200,341.31.  Bristol Heights has insufficient knowledge to admit or deny the remaining allegations of Paragraph 47 and leaves the plaintiff to its proof.

48.     Denied.

49.     Denied.

50.     Denied.

**FOURTH CAUSE OF ACTION (Breach of Duty)**

51.     Bristol Heights repeats and alleges its answers to the foregoing allegations as if fully set forth herein.

52.     Admitted.

53.     Admitted.

54.     Denied.

55.     Denied.

56.     Denied.

**FIFTH CAUSE OF ACTION (Good Faith and Fair Dealing)**

57.     Bristol Heights repeats and alleges its answers to the foregoing allegations as if fully set forth herein.

58.     It is admitted that Bristol Heights and Chicago Title owed each other a

**Exhibit B**

duty of good faith and fair dealing pursuant to the terms of the Policy.  Bristol Heights has insufficient knowledge to admit or deny the remaining allegations of Paragraph 58 and leaves the plaintiff to its proof.

    59.    Denied.

    60.    Denied.

    61.    Denied.

## SIXTH CAUSE OF ACTION (Liability)

    62.    Bristol Heights repeats and alleges its answers to the foregoing allegations as if fully set forth herein.

    63.    Bristol Heights has insufficient knowledge to admit or deny the allegations of Paragraph 63 and leaves the plaintiff to its proof.

    64.    Bristol Heights has insufficient knowledge to admit or deny the allegations of Paragraph 64 and leaves the plaintiff to its proof.

    65.    Bristol Heights has insufficient knowledge to admit or deny the allegations of Paragraph 65 and leaves the plaintiff to its proof.

    66.    Bristol Heights has insufficient knowledge to admit or deny the allegations of Paragraph 66 and leaves the plaintiff to its proof.

    67.    Bristol Heights has insufficient knowledge to admit or deny the allegations of Paragraph 67 and leaves the plaintiff to its proof.

**Exhibit B**

## Special Defenses / Counterclaims vs. Chicago Title Ins. Co.

## SPECIAL DEFENSE ONE / COUNTERCLAIM ONE (BREACH OF CONTRACT)

1.      On or about April 2, 2003, Bristol Heights purchased a title insurance policy from Chicago Title insuring title of property Bristol Heights purchased for the purpose of developing into a senior/condo housing complex in Bristol, Connecticut.

2.      On August 16, 2005, Bristol Heights received notice from the Bristol Tax Collector of a tax lien on the insured property in the amount of approximately $200,000, which had been mistakenly recorded more than ten years before under the name of the second-prior owner of the property, and which mistake the Bristol Tax Collector had only discovered days before it sent its letter to Bristol Heights.

3.      The tax lien is a defect in title that is covered by the title policy's general coverage provisions, and the policy contained no exception that would take the tax lien out of the policy's coverage.

4.      Chicago Title, after receiving notice of the tax lien, failed to take reasonable steps to protect Bristol Heights from an eventual tax foreclosure action by the Town of Bristol.  Instead, Chicago Title unreasonably and falsely accused Bristol Heights of prior knowledge of the tax lien, and of colluding with the seller of the property to hide this knowledge from Chicago Title at the time it issued the title policy to Bristol Heights. Chicago Title refused to provide insurance coverage to Bristol Heights until it completed an "investigation" into whether Bristol Heights had prior knowledge, demanding Bristol Heights' confidential, internal business documents, and placing Bristol Heights on notice that examinations under oath would be required of its members.

8

**Exhibit B**

5.     Chicago Title, by failing to protect Bristol Heights and instead falsely accusing Bristol Heights of collusion as a pretext for not providing insurance coverage, breached its contract with Bristol Heights.

6.     As a result of Chicago Title's breach, Bristol Heights was relieved of any further duties under its contract with Chicago Title, including the duty to cooperate in a phony investigation into prior knowledge, and including the duty not to pay the tax lien without Chicago Title's written consent.

7.     Because of Chicago Title's breach, Bristol Heights was forced to pay the tax lien in the amount of slightly more than $200,000 in order to clear title to its property.


**SPECIAL DEFENSE TWO / Counterclaim TWO** (BAD FAITH)

1-5.     Paragraphs 1-5 of Count One / Special Defense One are incorporated herein.

6.     Chicago Title accused Bristol Heights of prior knowledge of the tax lien in bad faith, because it had failed to convince the Town of Bristol to agree to a reduction in the amount of the tax lien.  Chicago Title knew that the Bristol Tax Collector had recorded the tax lien under a prior owner's name, that the tax lien had not been found in a title search conducted under the auspices of Chicago Title (by their issuing agent or his designee), and thus that Bristol Heights could not have known of the tax lien prior to August 16, 2005, when the Town of Bristol first notified Bristol Heights of the tax lien.

7.     Chicago Title's conduct violated the implied covenant of good faith and fair dealing.

**Exhibit B**

8.      As a result of Chicago Title's bad faith, Bristol Heights was relieved of any further duties under its contract with Chicago Title, including the duty to cooperate in a phony investigation into prior knowledge, and including the duty not to pay the tax lien without Chicago Title's written consent.

## COUNTERCLAIM THREE (Connecticut Unfair Trade Practices Act)

1-7.    Paragraphs 1-7 of Count Two / Special Defense Two are incorporated herein.

8.      Chicago Title has engaged in similar unfair claim settlement practices with other insureds, with such frequency as to constitute a general business practice of failing to fairly investigate and pay claims made by insureds under title policies issued by it, in violation of the Connecticut Unfair Trade Practices Act, § 42-110a *et. seq.*

WHEREFORE, Bristol Heights claims the following relief on its claims against Chicago Title Ins. Co.:

1.    Compensatory Damages;
2.    Punitive Damages under Count Two;
3.    Multiple Damages for violation of CUTPA;
4.    Attorney Fees;
5.    Costs;
6.    Prejudgment Interest; and
7.    Any other relief the Court deems just and appropriate.

**Exhibit B**

**Answer to Lew Volpicella's Cross-Claim**

1.    The Promissory Note speaks for itself.

2.    The Promissory Note speaks for itself.

3.    States a legal conclusion.

4.    The Promissory Note speaks for itself.

5.    Admitted that the Note has not been paid to date; denied that Bristol Heights has "neglected and failed" to make any due payments.

6.    The Promissory Note speaks for itself.

7.    Denied.


**Special Defenses to Cross-Claim**

**First Special Defense:  Laches**

1.    Prior to the date the Promissory Note was payable, and in light of the fact, as known by Mr. Volpicella, that there would not be enough money to pay the Note in 2004 and also continue to advance the development for which purpose Mr. Volpicella conveyed the property to which the Note pertained, Mr. Volpicella agreed in writing to an extension whereby the Note would be payable either when enough bridge financing were available to pay the Note without depleting funds needed to complete the pre-construction phase of the development, or when permanent construction financing was received from the U.S. Department of Housing and Urban Development.  Pursuant to the extension Mr. Volpicella would be paid all accrued interest on the original amount of the Note.

2.    Mr. Volpicella agreed to the extension with the intent to induce Bristol Heights into believing that he would await payment until construction financing were received, and with the intent that Bristol Heights rely on this belief by continuing to expend tremendous time, effort and money in advancement of the development, and knowing that it was uncertain when Bristol Heights would have enough money to pay the Note and that it was possible the Note would not be paid until permanent construction financing were received, and knowing that this would not occur until all necessary HUD pre-construction requirements were completed.

3.    If Mr. Volpicella had demanded payment in accordance with the Promissory Note's original due date, there would not have been enough money to continue advancing the development, which would defeat the purpose for which Mr.

11

**Exhibit B**

Volpicella had conveyed his property to Bristol Heights and entered into a joint venture. This was known to Mr. Volpicella, who agreed to the extension in order to allow Bristol Heights to use available funds for advancement of the development in the hope and expectation of a large profit, many times the amount owed on the Note, once the development is built. Mr .Volpicella considered the amount owed on the Note to be a "drop in the button" compared to the amount of money he expected to make on the development.

4.   In reliance on the extension, Bristol Heights has expended tremendous time, effort and money in furtherance of the development from 2004 to the present.

5.   Mr. Volpicella's cross-claim is precluded by virtue of his unreasonable and inexcusable delay in waiting five years to raise his claim of breach of the Promissory Note, to the extreme prejudice of Bristol Heights which changed its position by expending tremendous time, effort and money in advancement of the development the property.

**Second Special Defense: Estoppel**

1-4.   Paragraphs 1-4 of the First Special Defense are incorporated herein.

5.   Mr. Volpicella is estopped from claiming breach of the Promissory Note by virtue of his promise not to require payment until HUD construction financing was received, thereby inducing Bristol Heights' detrimental reliance in the form of expenditure of tremendous time, effort and money in advancement of the development of the property, which time, effort and money it would not have otherwise expended.

**Third Special Defense: Promissory Estoppel**

1-4.   Paragraphs 1-4 of the First Special Defense are incorporated herein.

5.   Mr. Volpicella's agreement to the extension constituted a clear and definite promise not to require payment of the Note until HUD construction financing were received, which promise Mr. Volpicella reasonably expected to induce Bristol Heights' reliance in the form of expenditure of tremendous time, effort and money in advancement of the development of the property, and which promise did, in fact, induce such reliance, to the detriment of Bristol Heights.

**Fourth Special Defense: Legal Consideration**

1-4.   Paragraphs 1-4 of the First Special Defense are incorporated herein.

12

**Exhibit B**

5.  The extension for payment of the Promissory Note was supported by legal consideration in the form of Bristol Heights' reliance in the form of expenditure of tremendous time, effort and money in advancement of the development of the property, as well as in the form of additional interest to be paid for the entire additional period during which payment was extended, and thus the extension is fully enforceable according to its terms.

## Counter-Cross-Claims

### COUNT ONE:  BREACH OF WARRANTY DEED

1.  Mr. Volpicella conveyed property to Bristol Heights via Warranty Deed, thereby warranting clear and good title.

2.  In fact, the property conveyed by Mr. Volpicella was encumbered by a tax lien in an amount that, as of August 2005, grew to approximately $200,000 with interest and penalties.  The encumbrance was not discovered until August 16, 2005, when the Bristol Tax Collector for the first time notified Bristol Heights of the existence of a tax lien that had been misrecorded under the name of Peoples Bank Realty, the owner prior to Mr. Volpicella, resulting in no notice ever being sent to Mr. Volpicella during his period of ownership of the property.

3.  The existence of the tax lien constitutes a breach of the Warranty Deed by Mr. Volpicella, irrespective of his lack of knowledge of the existence of the tax lien at the time he conveyed the property to Bristol Heights.

4.  As a result of Mr. Volpicella's breach of the Warranty Deed, Bristol Heights had to pay $200,341 in March 2006 in order to clear title, so it could use the property as security to obtain a bridge loan necessary to advance the real estate development for which the property was purchased form Mr. Volpicella.  Despite his breach, Mr. Volpicella has not paid, or offered to pay, the tax lien, or to reimburse Bristol Heights for its payment of the tax lien in March 2006.

5.  As a result of Mr. Volpicella's breach of the Warranty Deed, he is liable to Bristol Heights for the amount it paid to satisfy the tax lien, plus prejudgment interest.

### COUNT TWO:  BREACH OF FIDUCIARY DUTY

1.  As a member of Bristol Heights, LLC, Mr. Volpicella has a fiduciary duty to the other members.

2.  Mr. Volpicella, without Bristol Heights' knowledge and with the intent to realize personal gain at the expense of Bristol Heights, unilaterally arranged to have personal work performed on his auto parts store by an architect that had been

13

**Exhibit B**

hired by Bristol Heights to provide services in connection with the Bristol Heights development, which work Mr. Volpicella attempted to have billed to Bristol Heights.  When Bristol Heights informed the architect it had not authorized such work and would not pay for it, the relationship with the architect broke down, and he failed and refused to properly complete the work on the Bristol Heights development that he had been retained for.  As a result, it became necessary to hire a new architect, at great additional expense, to complete and correct the work of the first architect.

3.  Mr. Volpicella's conduct constituted a breach of his fiduciary duty to Bristol Heights and its other members.

4.  Mr. Volpicella's conduct interfered with the beneficial relationship between Bristol Heights and its architect.

5.  As a result of Mr. Volpicella's breach of fiduciary duty and tortious interference, Bristol Heights has suffered damages.

6.  On information and belief, Mr. Volpicella, either himself or through his agents, has provided confidential deposition testimony of Bristol Heights' members given in the present case, to Bristol Heights' adversary in an unrelated lawsuit, known as *Point Center Financial v. Bristol Heights*.  This conduct is a violation by Mr. Volpicella of his fiduciary duty to Bristol Heights, as well as Mr. Volpicella's violation of the non-disclosure agreement governing all LLC members.

## COUNT THREE: BREACH OF CONTRACT

1-6.  Paragraphs 1-6 of the previous count are incorporated herein.

7.  Pursuant to the agreement between Mr. Volpicella and Bristol Heights, Mr. Volpicella was to be a Limited Partner in Bristol Heights, LLC until the development was built, thereby insulating Mr. Volpicella from liability incurred during development, which by agreement would be assumed by Sentinel Equities Corp., Bristol Heights' majority owner and developer.  The additional benefit to Mr. Volpicella from this arrangement was that he would not be required to contribute a *pro rata* share of any cash-calls that became necessary in the event additional funding was needed beyond what was available from bridge loans.  In other words, despite being a 25% owner who would realize 25% of the net income ultimately realized by Bristol Heights, LLC, Mr. Volpicella was exempt from contributing to any cash infusions needed.  In return he was obligated not to interfere with or hinder Bristol Heights' efforts to bring the development to fruition.

8.  By breaching his fiduciary duty in the manners described above, Mr. Volpicella has breached his contractual obligation not to interfere with or hinder Bristol

14

**Exhibit B**

Heights' efforts to advance the development, and thus has forfeited his right not to be required to contribute a *pro rata* share of cash.

9.    Since Mr. Volpicella became a 25 % member of Bristol Heights, LLC in 2003, the other members have contributed large sums of money to advance the development.

10.   Mr. Volpicella is, therefore, liable to Bristol Heights in an amount equal to one-third of the total amount contributed by the other members.

Wherefore, Bristol Heights prays for the following relief on its claims against Lew Volpicella:

1.    Judgment in its favor on Mr. Volpicella's cross-claim;
2.    Damages on its counter-cross-claims;
3.    Costs; and
4.    Such other relief as the Court deems just and equitable.

The Defendant,
Bristol Heights Associates, LLC,
by its attorney:

Law Office of Bruce Matzkin, LLC
1052 Main Street, suite 14
Branford, CT 06405
(203) 488-0567
Fax: (203) 488-8079

# BRISTOL HEIGHTS CLAIMS A JURY TRIAL

15

**Exhibit B**

## MUTUAL RELEASE OF CLAIMS

Lew Volpicella and Bristol Heights Associates, LLC hereby agree as follows:

1.  Mr. Volpicella will withdraw his cross-claim against Bristol Heights in UWY-CV-07-4020477-S(X02) alleging breach of promissory note, and forever releases any claim that Bristol Heights breached the promissory note in 2004 (its original due date) or at any time prior to the date this Mutual Release is signed.  Said promissory note shall remain in full force and effect, and in the event Bristol Heights later breaches (i.e., if it fails to pay the promissory note pursuant to its terms as amended pursuant to a Memorandum of Understanding dated March 4, 2004), nothing herein shall preclude Mr. Volpicella from bringing a claim or claims based on any such later breach.

2.  Bristol Heights will withdraw its counter-cross-claims against Mr. Volpicella in the same case alleging breach of fiduciary duty, breach of contract and breach of warranty deed, and forever releases any and all such claims, known or unknown against Volpicella, based on any conduct alleged therein and/or any conduct occurring up to the date of this document.

3.  In the event Bristol Heights later breaches the promissory note and Mr. Volpicella brings an action to collect, Bristol Heights will not raise and shall be barred from raising as a defense that the breach occurred at any time prior to the execution of this Mutual Release of Claims and thus that the claim is barred by the statute of limitations.  Bristol Heights acknowledges that any statute of limitations applicable to a claim by Mr. Volpicella of a later breach of the promissory note by Bristol Heights will not begin to run until such later breach, and did not begin to run in 2004 and has not begun to run as of the date of this document.

4.  Bristol Heights forever releases any claims it has under Connecticut statutory (§ 52-568) or common law for vexatious litigation against either Mr. Volpicella or his attorney, based on their having filed the cross-claim against Bristol Heights alleging breach of the promissory note.

5.  Neither party will bring claims of any kind against the other in the present litigation, and any new claims arising subsequent to the date of this document will be brought in a separate action.


_____        Date: _10/29/09_____
Lew Volpicella


_____        Date: _10-22-09_____
Bristol Heights Associates, LLC, by
William Orlandi, Manager


**Exhibit C**

**WITHDRAWAL**
JD-CV-41 Rev. 10-01

**STATE OF CONNECTICUT**
**SUPERIOR COURT**
www.jud.state.ct.us

DOCKET NO.
UWY-CV-07-4020477 S (X02)
RETURN DATE

COMPLETE ALL SECTIONS BELOW

NAME OF CASE (FIRST-NAMED PLAINTIFF VS. FIRST- NAMED DEFENDANT)
Chicago Title Ins. Co. v. Bristol Heights Associates, LLC

☑ Judicial District    ☐ Housing Session    ☐ G.A. No. ____

ADDRESS OF COURT (No., street, town and zip code)
400 Grand St., Waterbury 0670-

SECTION I (check only one box) THIS WITHDRAWAL IS BEING FILED BECAUSE THE DISPUTE HAS BEEN RESOLVED BY:

**I. COURT-ANNEXED ADR**

411088 ☐ Early Intervention
411089 ☐ Early Neutral Evaluation
411090 ☐ Attorney Trial Referee
411091 ☐ Fact-Finding
411093 ☐ Arbitration
411094 ☐ Mediation
411095 ☐ Special Masters
411096 ☐ Summary Jury Trial

**II. COURT INTERVENTION**

411098 ☐ Pretrial Conference
411099 ☐ Trial Management Conference
411100 ☐ Commencement of Trial    (court trial - first witness sworn; jury trial - trial jurors sworn)

**III. PRIVATE ADR**

411102 ☐ Provider Name: ____

**IV. OTHER**

411103 ☑ Discussion of Parties on Their Own
415602 ☐ Unilateral Action of Party(ies)

**SECTION II    WITHDRAWAL**

(Do not check the following two boxes if any intervening complaints, cross complaints, counterclaims, or third party complaints remain pending in this case. See below for partial withdrawal of action.)

**DISPOSITIVE**

(WDACT) ☐ The Plaintiff's action is WITHDRAWN AS TO ALL DEFENDANTS without costs to any party.
(WOARD) ☐ A judgment has been rendered against Defendant(s): ____

and the Plaintiff's action is WITHDRAWN AS TO ALL REMAINING DEFENDANTS without costs.

**PARTIAL**

The

(WDCOMP) ☐ Complaint
(WDCOUNT) ☐ Counts of the complaint: ____
(WDINTCO) ☐ Intervening Complaint
(WDTHPC) ☐ Third Party Complaint
(WAPPCOM) ☐ Apportionment Complaint
(WDCC) ☑ Cross Complaint (cross claim)   Bristol Heights cross-claims vs. Lew Volpicella.
(WOC) ☐ Counterclaim
(WOAAP) ☐ Plaintiff(s): ____
(WOAAD) ☐ Complaint against defendant(s): ____    only w/o costs
☐ Other: ____

in the above entitled action is withdrawn.

**SIGNATURE REQUIRED**

Plaintiff ____ ; By ____ Attorney
Plaintiff ____ ; By ____ Attorney
Defendant Bristol Heights ; By Bruce Matzkin Attorney
Defendant ____ ; By ____ Attorney

**NAME & ADDRESS OF SIGNER:** ➡ Bruce Matzkin, 1052 Main St., Suite 14, Branford, CT 06405

**SECTION III    CERTIFICATION**

I hereby certify that a copy was mailed/delivered to all counsel and pro se parties of record on:
DATE 11/3/09

SIGNED (Individual attorney or pro se party)
X ____

PHONE NO. (Area code first)
203-488-0567

NAME OF EACH PARTY SERVED *
1. Chicago Title
2. Lew Volpicella

ADDRESS AT WHICH SERVICE WAS MADE *
1. c/o Robinson + Cole
2. c/o John Lewis, Esq.

* If necessary, attach additional sheet with names of each party served and the address at which service was made.

**Exhibit C**

<u>Addendum to Mutual Release of Claims</u>

In order to clarify an agreement between Lew Volpicella and Bristol Heights entitled Mutual Release of Claims ("the agreement"), whereby they withdrew their respective cross-claims against one another, the parties stipulate as follows:

Lew Volpicella stipulates that he will not raise the agreement as a defense to Chicago Title's subrogation claim.  If necessary to respond to a claim by Chicago Title that they are entitled to discovery of the agreement or that they have a defense to Bristol Heights' claims as a result of the agreement, Mr. Volpicella agrees that he will provide a signed stipulation to Chicago Title, Bristol Heights and the court, stating: "I, Lew Volpicella, hereby stipulate that I will not raise any agreement between myself and Bristol Heights concerning the withdrawals of our respective cross-claims as a defense to Chicago Title's subrogation claim, and hereby waive any such defense.  I do not waive any other defenses to CTIC's subrogation claim."

Mr. Volpicella acknowledges that it would be a breach of the agreement if he raised the agreement as a defense to Chicago Title's subrogation claim and thereby defeated or diminished Bristol Heights' ability to recover, and that if he raises such a defense the agreement is void and both parties could pursue the claims that are the subject of the agreement.  Bristol Heights stipulates that once Mr. Volpicella signs this Addendum and provides the above-quoted written stipulation/waiver (if necessary to respond to a claim by Chicago Title that they are entitled to discovery of the agreement or that they have a defense to Bristol Heights' claims as a result of the agreement), there can be no claim by Bristol Heights of breach of the agreement by Mr. Volpicella, and Bristol Heights cannot pursue any of the claims that were released in said agreement, even in the event Chicago Title obtains the agreement through a discovery order and successfully uses the agreement to defeat or diminish Bristol Heights' claim.

This Addendum may be signed in counterparts.  Each party shall provide the other with a signed counterpart.

_____          _____
Lew Volpicella,                                    Bristol Heights

**Exhibit C**

## STIPULATION

"I, Lew Volpicella, hereby stipulate that I will not raise any agreement between myself and Bristol Heights concerning the withdrawals of our respective cross-claims as a defense to Chicago Title's subrogation claim, and hereby waive any such defense.  I do not waive any other defenses to CTIC's subrogation claim."

_11/19/09_
Date

_[signature]_
Lew Volpicella

**Exhibit C**

# UNITED STATE DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| BRISTOL HEIGHTS ASSOCIATES, LLC, | ) | |
| | ) | CIVIL ACTION NO.: |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| CHICAGO TITLE INSURANCE CO., | ) | |
| | ) | February 1, 2010 |
| Defendant. | ) | |
| | ) | |

## COMPLAINT

### Parties

1.  The Plaintiff, Bristol Heights Associates, LLC, is a Connecticut limited liability company. Its members reside in Connecticut, Massachusetts, Rhode Island and California.

2.  The Defendant is an insurance company incorporated, on information and belief, under the laws of the State of Missouri. They have a place of business located at Ten Columbus Blvd., Hartford, CT.

### Jurisdiction

1.  This complaint is brought under federal diversity jurisdiction, pursuant to 28 U.S.C. § 1332. The amount in controversy is over $200,000.

### Count One:  Breach of Contract

1.  On or about April 2, 2003, Bristol Heights purchased a title insurance policy from Chicago Title, insuring title to property procured by Bristol Heights for the purpose of constructing a 300-plus-unit senior/assisted/condo housing development in Bristol, Connecticut.

2.  The property was conveyed to Bristol Heights, *via Warranty Deed*, by Lew Volpicella, with whom Bristol Heights had entered into a joint venture for the development of the property. In exchange for contributing the property to the joint venture, Mr. Volpicella received a 25% ownership interest in Bristol Heights, and a promissory note for $800,000 plus interest. The promissory note is payable when Bristol

**Exhibit D**

Heights receives construction financing, which has not yet occurred, and which may or may not occur at some indefinite future time.

3.     Mr. Volpicella had purchased the property in May of 1994, from Peoples Bank.  Throughout the period of his ownership, he paid all tax bills he received, and none alerted him to any unpaid back taxes, nor were any of his tax payments applied to any taxes other than those for which he was billed.

4.     On August 16, 2005, more than two years after taking title, Bristol Heights received a letter from the Bristol Tax Collector demanding payment for a tax lien on the insured property in the amount of slightly over $200,000, which arose from taxes going back to the Grand List of October 1, 1993.  Enclosed with the letter was a copy of a letter to Peoples Bank, dated August 15, 2005, which explained that the Tax Collector had mistakenly billed Peoples Bank for the taxes and would instead pursue payment with the current owner, Bristol Heights.  The letter enclosed copies of demands (over 140 of them, one for each lot into which the property was subdivided at the time of the assessment) addressed to Peoples Bank.

5.     The Bristol Tax Collector, after mailing the demands to Peoples Bank earlier in August 2005 and receiving a call from an employee of Peoples Bank, who explained that Peoples Bank had not been the owner of the property since 1994, researched the land records and discovered that the taxes had been misrecorded under Peoples Bank after Peoples Bank had already sold the property to Mr. Volpicella, and thus Mr. Volpicella had never been billed for the taxes or notified of the tax lien.

6.     The tax lien was a defect in title covered by the title policy's general coverage provisions, and the policy contained no exception that would take the tax lien out of the policy's coverage.

7.     Bristol Heights notified Chicago Title of the tax lien on September 1, 2005.

8.     Chicago Title, after receiving notice of the tax lien, failed to take any steps to insure Bristol Heights against an impending tax foreclosure action by the Town of Bristol, or to recover the amount of the tax lien from Mr. Volpicella for his breach of the Warranty Deed.  Instead, more than four months after receiving the claim, and having failed to convince the Town of Bristol to reduce the amount of the tax lien, Chicago Title unreasonably and falsely claimed, for the first time, that they could not determine whether the tax lien was covered until they conducted an investigation into whether Mr. Volpicella and Bristol Heights actually knew about the tax lien and colluded to hide this knowledge from Chicago Title at the time of the property conveyance.  Chicago Title raised this as grounds for delaying coverage, despite that by giving *a Warranty Deed* Mr. Volpicella *guaranteed* his own liability for the taxes, which defies that he knew of the tax lien, let alone colluded with Bristol Heights to hide it from Chicago Title.  Chicago Title notified Bristol Heights that they were requiring Bristol Heights to turn over its

**Exhibit D**

confidential, internal business documents, and further placed Bristol Heights on notice that examinations-under-oath would be required of its members.

9.    Chicago Title conjured up an investigation into prior knowledge despite all of the facts known to them that completely contradicted that there was prior knowledge by Bristol Heights, or Mr. Volpicella. These included, as Chicago Title was aware, (a) the fact that the Tax Collector had never, before August 16, 2005, notified *either* Bristol Heights *or* Mr. Volpicella of a tax lien for unpaid taxes on the 1993 Grand List, but had until that time mistakenly sent any bills for these taxes to Peoples Bank; (b) the fact that the tax lien was not discovered by Chicago Title when they conducted a title search in conjunction with the issuance of the policy to Bristol Heights in 2003; and (c) the fact that Mr. Volpicella conveyed title to Bristol Heights *via Warranty Deed*, which is inconsistent with attempting to avoid liability for a known tax lien, as the Warranty Deed *guaranteed*, rather than avoided, Mr. Volpicella's liability for the tax lien. Despite there being no legal basis for "imputing" any knowledge of Mr. Volpicella to Bristol Heights, Chicago Title, lacking any evidence that Bristol Heights *actually* knew of the tax lien, falsely raised "imputation" in order to complete their purported justification for avoiding coverage.

10.    Chicago Title had no reasonable basis for suspecting prior knowledge by either Mr. Volpicella or Bristol Heights, or for asserting that Mr. Volpicella's knowledge, if he had it, was "imputable" to Bristol Heights. Chicago Title's investigation into prior knowledge was a pretext to delay or avoid accepting coverage for the tax lien. By failing to accept coverage for a clearly-covered claim, Chicago Title was in breach of their insurance contract.

11.    Chicago Title was aware that Bristol Heights had a bridge loan coming due in early March 2006, and that in order to refinance that loan and avoid being in default – which could lead to a foreclosure – title to the property needed to be cleared of the tax lien. Nevertheless, Chicago Title continued to refuse to accept coverage or take any actions whatsoever to protect Bristol Heights, such as bringing a declaration action against the Town of Bristol to challenge the amount of the tax lien based on the fact that the Town had failed to properly record the taxes and had failed to notify the correct property owner for more than 11 years, allowing the taxes to grow several-fold with interest and penalties. Chicago Title's inaction placed Bristol Heights in the untenable position of being forced to pay the tax lien in order to avoid (a) a tax foreclosure by the Town of Bristol, (b) defaulting on a bridge loan, and (c) a mortgage foreclosure by the lender that would have followed a default on the bridge loan.

12.    As a result of Chicago Title's unreasonable failure to insure Bristol Heights and their invention of a false pretext to justify their refusal to accept coverage of the tax lien, Bristol Heights was relieved of any further duties under its contract with Chicago Title, including the duty to cooperate in a phony investigation into prior knowledge, and including the duty to obtain Chicago Title's written consent before paying the tax lien in order to clear title so it could avoid the detrimental consequences of

**Exhibit D**

failing to do so, given Chicago Title's refusal to lift a finger in fulfillment of their duty as Bristol Heights' insurer.

13.     Because of Chicago Title's breach, Bristol Heights was forced to pay the tax lien in the amount of slightly more than $200,000 in order to clear title to its property, which payment was made on March 8, 2006.

14.     Bristol Heights' payment of the tax lien was accompanied by a letter stating as follows:

> Bristol Heights disputes that the past due taxes and interest in the amount of $200,341.31 are rightfully due and payable . . . . It is Bristol Heights continued belief and opinion . . . that these taxes . . . were improperly and excessively based on assessment of this acreage as individual lots in an expired subdivision. Moreover, taxes would have been paid years earlier, and, the interest portion of the claim, which is more than twice the amount of the taxes, would have been avoided if the Tax Collector's Office had notified the then owner of the property of the delinquency, as required by Sect. 12-715 of the Connecticut General Statutes or had notified the owner of the delinquency each year thereafter by applying the currently paid taxes to the delinquency.
>
> Accordingly, although Bristol Heights is paying the full amount of $200,341.31 by the attorney's client fund check enclosed herein, it is doing so only under protest. Bristol Heights reserves any and all rights that it may have against the City of Bristol to recover these taxes and/or interest in an appropriate future proceeding.

By paying under protest, Bristol Heights preserved Chicago Title's ability to challenge the taxes in a refund action, on all grounds that could have been raised in a pre-payment declaration action, had Chicago Title initiated one in fulfillment of their insurance obligation.

15.     By paying under protest despite having no duty to Chicago Title to do so, Bristol Heights took steps to protect Chicago Title's rights as its subrogee. Whereas Bristol Heights, the insured, took steps to protect Chicago Title, the insurer, Chicago Title continued to refuse to accept coverage or take any steps to insure Bristol Heights.

16.     Even after Bristol Heights paid the taxes under protest, thereby preserving Chicago Title's ability to challenge the taxes in court, Chicago Title continued to refuse to take steps as Bristol Heights' insurer to seek a refund in court. Instead, Chicago Title continued to engage Bristol Heights in *de facto* litigation, insisting on receiving its internal documents and conducting examinations-under-oath, in search of something on which to base a coverage denial.

17.     On July 21, 2006, Bristol Heights and Mr. Volpicella gave examinations-under-oath, conducted by Chicago Title's attorney. Three days later, July 24, 2006,

**Exhibit D**

Bristol Heights turned over all of the internal business documents Chicago Title had insisted on receiving for its investigation, in reliance on Chicago Title's attorney's promise that the confidentiality of Bristol Heights' documents would be maintained, that they would be used only for purposes of coverage determination, and that they would not be attached to any public court filings. Despite that the documents revealed no evidence of prior knowledge of the tax lien, but only confirmed what Chicago Title already knew and which Bristol Heights had freely and openly admitted (that Mr. Volpicella gave the property as part of a joint venture and received a 25% interest in Bristol Heights and a promissory note in lieu of present cash), Chicago Title nevertheless continued to refuse to accept coverage and continued to fail to take any action to insure Bristol Heights.

18. At the time Chicago Title had completed their investigation and learned of no evidence of prior knowledge, July 2006, less than one year had elapsed since Bristol Heights was first notified of the tax lien, and so Chicago Title, without having even gone out-of-pocket (since Bristol Heights had), still had the opportunity to act as an insurer and bring an action against the Town of Bristol for a refund, and/or an action against Mr. Volpicella.

19. Instead of then challenging the taxes in a court action for a refund, Chicago Title allowed the remaining time available to initiate such court action to expire. Then, in March 2007, Chicago Title preemptively sued Bristol Heights in a declaration action in Connecticut Superior Court, continuing to claim that Bristol Heights had prior knowledge of the taxes, either directly or by imputation through Mr. Volpicella, and also claiming that by initially refusing to cooperate in their investigation, and by paying the tax lien without their written consent, Bristol Heights had breached its duties such that Chicago Title was excused from covering the tax lien even if the lien would otherwise have been covered. They made these claims even though they were not prejudiced (as an insurer must be in order to be excused from an otherwise-covered claim based on conduct of the insured), because they could have still pursued a refund in court after they completed their investigation and found no evidence of prior knowledge. Instead of suing the Town for a refund of the taxes, and instead of suing Mr. Volpicella for breach of the Warranty Deed, Chicago Title chose to sue their insured, Bristol Heights.

20. Despite Chicago Title's assurance of maintaining the confidentiality of Bristol Heights' documents, on which assurance Bristol Heights relied in providing the documents (see paragraph 17 above), Chicago Title *twice* attached these documents to their public court filings in Connecticut Superior Court, offering them as supposed "evidence" of prior knowledge simply by virtue of the fact that they showed Mr. Volpicella and Bristol Heights are partners in a joint venture, and that Mr. Volpicella accepted a 25% ownership interest and a promissory note for the property in lieu of present cash (all of which was acknowledged even before the documents were turned over). The Connecticut Superior Court, Shortall, J.T.R., ruled that this evidence of prior knowledge amounted purely to speculation, and was not reasonable or logical.

21. Chicago Title's refusal to accept coverage for the tax lien on the false ground that they needed to investigate prior knowledge, was a breach of contract. As a

result of Chicago Title's breach, Bristol Heights was forced to pay the tax lien, and thereby incurred damages in the amount of the tax lien (slightly over $200,000), as well as the loss of use of these funds since March 2006.

## Count Two:  Misrepresentation

1.       Paragraph 1-21 of Count One are incorporated herein.

22.     Chicago Title misrepresented that they would use Bristol Heights' internal documents only to determine coverage and that they would maintain the confidentiality of the documents and not attach them to any public court filings.  Bristol Heights turned over its documents in reliance on these representations.

23.     Chicago Title knew that they did not intend to accept coverage even if, as was true, Bristol Heights' documents did not contain any evidence to suggest that Bristol Heights and/or Mr. Volpicella had prior knowledge of the tax lien.  Chicago Title intended to claim prior knowledge regardless, and to use the documents as "evidence" of prior knowledge by claiming that the facts that Mr. Volpicella and Bristol Heights were in a joint venture and that Mr. Volpicella received a promissory note in lieu of present cash when he conveyed the property, somehow established that they colluded to hide knowledge of the tax lien.

24.     On information and belief, competitors of Bristol Heights have obtained copies of its internal documents from the public court file, and have used them to advance competitive activities against Bristol Heights' interests.  The publication of Bristol Heights' documents has resulted in damages to Bristol Heights in an amount to be established at trial.

## Count Three: Breach of the Covenant of Good Faith and Fair Dealing

1-21.   Paragraphs 1-21 of Count One are incorporated herein.

22.     Chicago Title's investigation into prior knowledge was a pretext to delay or avoid paying the tax lien under the insurance policy they issued to Bristol Heights.

23.     Chicago Title's conduct in refusing to accept coverage on a demonstrably false basis (i.e., the information known to them at the time contradicted any prior knowledge of the tax lien by Bristol Heights, or Mr. Volpicella), and out of a dishonest motive to avoid paying, violated the implied covenant of good faith and fair dealing.

24.     Chicago Title's knowledge of the urgency to Bristol Heights of clearing title in time to avoid defaulting on a bridge loan, further demonstrates their bad faith in leaving Bristol Heights no alternative but to pay the tax lien out of its own pocket, despite that it had purchased insurance to cover such a situation.

6

**Exhibit D**

25.     As a result of Chicago Title's bad faith in refusing to accept coverage once it had enough information to know that the claim was valid, Bristol Heights was relieved of any further duties under its contract with Chicago Title, including the duty to cooperate in a phony investigation into prior knowledge, and including the duty not to pay the tax lien without Chicago Title's written consent.

26.     Chicago Title further violated the covenant of good faith and fair dealing by claiming, pursuant to their rights under the policy, to need to investigate prior knowledge, and using this as grounds for demanding Bristol Heights' internal documents, when they intended to claim that the documents were themselves "evidence" of prior knowledge even though the documents contained nothing to support such a claim.

27.     Chicago Title further violated the covenant of good faith and fair dealing by engaging Bristol Heights in *de facto* litigation in search of some basis to justify not accepting coverage of the insurance claim, thereby forcing Bristol Heights to divert time and resources, when as Chicago Title showed, even after Bristol Heights fully cooperated they had no intention of fulfilling their coverage obligation.

28.     Chicago Title further violated the covenant of good faith and fair dealing when they purposefully and unreasonably delayed the Superior Court litigation in order to further damage Bristol Heights and its ability to recover its money. In particular, after filing the litigation in March 2007, Chicago Title failed to conduct any depositions for 18 months, even though there was a September 2008 trial date. For this reason alone, the court postponed the trial to July 2009, giving Chicago Title until January 31, 2009 to file any summary judgment motions. Chicago Title then failed to conduct depositions for the next four months, and conducted six of them in January 2009. Chicago Title then requested and received an additional month to file a summary judgment motion. After they filed a lengthy motion on March 2, 2009, and Bristol Heights filed a response on March 11, 2009, the Presiding Judge, *sua sponte*, transferred the litigation to the Complex Litigation Docket, vitiating the July 2009 trial date. As of the date of the filing of this federal court action, there is no trial date in place on Chicago Title's declaratory judgment action.

29.     As a result of Chicago Title's breach of the covenant of good faith and fair dealing, Bristol Heights has been further damaged by virtue of the increased legal fees is has incurred since September 2008, when the issue of insurance coverage would have been decided had Chicago Title not purposely delayed.

30.     As a result of Chicago Title's breaches of the covenant of good faith and fair dealing, Bristol Heights is entitled to punitive damages under Connecticut law.

### Count Four:  Connecticut Unfair Trade Practices Act

1-30.     Paragraphs 1-30 of Count Three are incorporated herein.

**Exhibit D**

31.     Chicago Title has engaged in similar unfair claim settlement practices with other insureds, where they have failed to accept coverage of valid claims, with such frequency as to constitute a general business practice of failing to fairly investigate and pay claims made by insureds under title policies issued by them, in violation of the Connecticut Unfair Trade Practices Act, § 42-110a *et. Seq.*

WHEREFORE, Bristol Heights claims the following relief on its claims against Chicago Title Ins. Co.:

1.     Economic Damages under Count One for the amount of the tax lien, plus prejudgment interest thereon;
2.     Compensatory and Punitive Damages under Count Two;
3.     Compensatory and Punitive Damages under Count Three;
4.     Multiple Damages and Attorney Fees under Count Four;
5.     Costs;
6.     Any other relief the Court deems just and appropriate.

The Plaintiff claims a jury trial.

The Plaintiff,
Bristol Heights Associates, LLC,
by its attorney:

Bruce Matzkin (ct 22980)
Law Office of Bruce Matzkin, LLC
1052 Main Street, suite 14
Branford, CT 06405
(203) 488-0567
Fax: (203) 488-8079

8

**Exhibit D**

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

BRISTOL HEIGHTS ASSOCIATES,    :
LLC,
                               :

    Plaintiff,
                               :   CASE NO. 3:10-CV-154(RNC)
V.
                               :

CHICAGO TITLE INSURANCE CO.,
                               :
    Defendant.

RULING AND ORDER

On February 18, 2011, an oral ruling was issued in this case granting the defendant's renewed motion to dismiss (doc. 38). Counsel were informed that this memorandum would follow.

I.  Background

In February 1, 2010, plaintiff Bristol Heights Associates, LLC brought this diversity case against defendant Chicago Title Insurance Company asserting state law causes of action relating to a title insurance coverage dispute.  The complaint pleaded claims for breach of contract, misrepresentation, breach of the covenant of good fath and fair dealing, and violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110a, *et seq.*  The parties' dispute had been the subject of declaratory judgment litigation initiated by Chicago Title against Bristol Heights in Connecticut Superior Court in March 2007, which remained pending.  See Chicago Title Insurances Co. V. Bristol Heights Associates, LLC, Case No. (XO2)UWY-CV-07-4020477-S (Complex Litigation Docket, Judicial District of

**Exhibit E**

Waterbury).  In the state court action, Bristol Heights had filed a counterclaim, which included the same breach of contract, bad faith and CUTPA claims contained in the complaint it filed here. On December 23, 2009, the Superior Court had granted Chicago Title's motion for summary judgment on the latter two claims, and, on February 1, 2010, it had denied Bristol Heights' motion to reargue, prompting Bristol Heights to take the extraordinary steps of commencing a new action in this court and withdrawing the state court counterclaim in full.

Chicago Title responded to the complaint filed by Bristol Heights in this court by moving to dismiss or stay this action under the Colorado River abstention doctrine, which permits a federal district court to abstain in deference to litigation in state court in exceptional circumstances.  Colorado River Water Conservation District v. United States, 424 U.S. 800 (1976). Chicago Title urged that Bristol Heights was engaged in improper tactical maneuvering in that it had come to federal court only after suffering an adverse summary judgment ruling on the merits of its claims in state court.  Bristol Heights replied that it should be permitted to proceed in this forum because it needed a prompt adjudication of the parties' coverage dispute and was concerned about anticipated delays in the state court action. Bristol Heights emphasized that it had withdrawn the counterclaim in state court, which it claimed a right to do under state rules

2

**Exhibit E**

of procedure.  Bristol Heights urged that its withdrawal of the counterclaim undermined Chicago Title's reliance on the <u>Colorado River</u> doctrine.

On July 9, 2010, I issued an oral ruling granting the motion to stay on the basis of <u>Colorado River</u>.  After weighing the relevant factors in the particular context created by Bristol Heights' unusual maneuvering,[1] I concluded that a stay was appropriate considering the reactive nature of this action;[2] the advanced stage of the state court litigation, which had been pending for almost three years;[3] and the absence of evidence

---

[1]  The <u>Colorado River</u> doctrine requires consideration of the following factors: assumption of jurisdiction by either court over a res or other property; inconvenience of the federal forum; avoidance of piecemeal litigation; the order in which jurisdiction is obtained; and whether the state court proceeding will adequately protect the rights of the federal plaintiff. <u>See</u> <u>Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.</u>, 460 U.S. 1, 16 1983).

[2]  A reactive suit is one that is filed by a party who has suffered an adverse decision in another court.  <u>See</u> <u>Telesco v. Telesco Fuel & Masons' Materials, Inc.</u>, 765 F.2d 356, 363 (2d Cir. 1985); <u>Lops v. Lops</u>, 140 F.3d 927, 962-63 (11th Cir. 1998). <u>See</u> <u>also</u> <u>American Disposal Services, Inc. v. O'Brien</u>, 839 F.2d 84, 88 (2d Cir. 1988); <u>The Cadle Co. v. Cohen</u>, 173 F.3d 843 (2d Cir. 1999).  A party's withdrawal of state court claims that are subsequently reasserted in a new action in federal court is strong evidence of reactive litigation.  <u>See</u> <u>Nakash v. Marciano</u>, 882 F.2d 1411, 1413 (9th Cir. 1989), <u>Gray v. Degussa Corp.</u>, No. 02 C 7209, 2003 WL 21659450, at *3 (N.D. Ill. July 15, 2003).

[3]  Discovery in the state court action had been completed, extensive briefing and argument had taken place on cross-motions for summary judgment, the cross-motions had been decided, and a trial date had been set for February 2012 with the consent of Bristol Heights.

**Exhibit E**

showing that the procedures available to Bristol Heights in state court were inadequate.[4]  I recognized that if the state court restored the counterclaim to the docket and was able to accelerate the trial date, exercising federal jurisdiction would be gratuitous.  See Gen. Star Int'l Indemnity Ltd. v. Chase Manhattan Bank, No. 01 CIV. 11379 AGS, 2002 WL 850012, at *11 (S.D.N.Y. May 3, 2002), aff'd, 57 Fed. Appx. 892 (2d Cir. 2003)(granting stay and declining to declare state procedures inadequate when party had failed to take advantage of state remedies).

Bristol Heights then moved in state court for a trial date before the end of 2010.  On August 10, 2010, following a status conference, the state court issued an order setting the trial for February 1, 2011, the next date all counsel would be available. The state court thereby accelerated by one year the February 2012 trial date it had previously established with the consent of Bristol Heights.

Three weeks later, on August 31, 2010, Bristol Heights filed an emergency motion in this court seeking to lift the stay and

---

[4]  A state procedure is inadequate if it fails to protect a party's federal rights.  Woodford v. Community Action Agency of Green County, 239 F.3d 517, 525 (2d Cir. 2001).  Bristol Heights complained about past and anticipated delays in the state court action but its assertions provided no basis for a determination that the procedures available in state court either had been or were likely to be inadequate, especially since it had agreed to a trial date in state court in February 2012.

requesting a trial here the week after Thanksgiving. Bristol Heights claimed that Chicago Title's counsel had succeeded in delaying a trial in state court by failing to agree to a trial prior to February 2011. In support of its request for a trial in federal court the week after Thanksgiving, Bristol Heights agreed to voluntarily dismiss its bad faith and CUTPA claims, which had been dismissed by the state court when it granted Chicago Title's motion for summary judgment. See Plaintiff Bristol Heights' "Emergency" Motion to Lift Stay and For a 2010 Trial Date In the Week After Thanksgiving (doc. 35) at 14 ("because of this Court's concern over appearing to allow a claim to be revived that was dismissed in state court, Bristol Heights agrees to dismissal of its bad faith and CUTPA claims").

One week later, on September 8, 2010, the state court granted Chicago Title's motion to restore Bristol Heights' counterclaim to the state court docket in the absence of opposition. The order granting the motion to restore the counterclaim explicitly referred to Bristol Heights' breach of contract claim, but not the bad faith and CUTPA claims.

Chicago Title then filed papers in opposition to Bristol Heights' "emergency" motion in this court. In doing so, Chicago Title requested that the stay under Colorado River be converted into a dismissal with prejudice. In support of its renewed motion to dismiss, Chicago Title stated:

**Exhibit E**

> [U]nless the District Court dismisses this case
> altogether, [Bristol Heights] will be further
> emboldened and will continue to utilize the Superior
> Court and District Court improperly, rearguing each
> issue in whichever forum [it] believes might yield a
> better outcome than was reached in the other.  The
> Emergency Motion is exactly such a situation. [Bristol
> Heights] comes before the District Court apparently
> dissatisfied with what it achieved in Superior Court,
> but without any greater cause than it originally
> presented in July.  Its case should be dismissed with
> prejudice.  Respectfully, this litigant needs to be
> told that its conduct has been abusive and beyond the
> pale of reasonable behavior under federal law and
> procedure.

Defendant's Memorandum in Opposition To Emergency Motion To Lift Stay and Renewed Motion to Dismiss With Prejudice (Doc. 37) at 2-3.

In February 2011, trial began in the state court action. The trial encompassed Chicago Title's claim for a declaratory judgment and Bristol Heights' counterclaim for breach of contract.

After the trial commenced in state court, a telephone conference was convened in this case.  During the call, I informed counsel that because the state court action had proceeded to trial as scheduled, Chicago Title's renewed motion to dismiss would be granted.  Bristol Heights protested that its bad faith and CUTPA claims had not been restored to the state court docket.  I concluded that dismissal was still warranted and therefore granted the renewed motion to dismiss.

6

**Exhibit E**

II. <u>Discussion</u>

The Supreme Court has made it clear that a federal district court may not abstain in deference to parallel litigation in state court except in very limited circumstances. <u>Colorado River</u>, 424 U.S. at 813-24.[5] The Second Circuit has cautioned district judges that "abstention is appropriate only in rare circumstances and is justified neither by the mere existence of parallel state court proceedings nor by the simple administrative convenience of deferring to the state forum." <u>The Cadle Co. v. Cohen</u>, 173 F.3d 843, at *2 (2d Cir. 1999)(unpublished opinion). In exercising their very limited discretion to abstain, district courts must be guided by principles of "wise judicial

---

[5] The proceedings at issue here are parallel, although Bristol Heights' bad faith and CUTPA claims have not been restored to the state court docket, because the parties, issues and relief sought in both cases are substantially the same. <u>Dittmer v. County of Suffolk</u>, 146 F.3d 113, 118 (2d Cir. 1998); <u>Nat'l Union Fire Ins. v. Karp</u>, 108 F.3d 17, 22 (2d Cir. 1997). In the state court action, Chicago Title sought a declaratory judgment that it has no liability under the title insurance contract. In this action, Bristol Heights sought a trial on its breach of contract claim, which it characterized as its "chief claim," while agreeing to voluntarily dismiss its other claims, which had been dismissed in state court. Moreover, those claims relate directly to the contract dispute. <u>See</u> <u>Great American Ins. Co. v. Precision Products Corp.</u>, No. 92-1083, 1992 WL 188886, at *1 n. 2 (1st Cir. Aug. 7, 1992)(affirming abstention when federal insurance action contained additional claims not squarely related to issue of policy coverage because "the overall claims related to the basic dispute relating to coverage"). If required to respond on the merits in this court, Chicago Title undoubtedly would have taken the same position in this court that it advanced in state court. <u>C-BASS v. Lictenfels</u>, 658 F. Supp. 2d 355, 360 (D. Conn. 2009)(considering likely responsive pleadings when deciding if action is parallel).

**Exhibit E**

administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." <u>Id.</u> at *1 (internal quotations and citations omitted).

In the circumstances presented here, wise principles of judicial administration strongly favor abstention to serve the goal of avoiding piecemeal litigation of duplicative claims, particularly in view of the reactive nature of this action, the advanced stage of the state court action at the time this action was brought and the current status of the state court action. <u>See</u> <u>The Cadle Company</u>, 173 F.3d at *2.[6]

The Supreme Court has recognized that there is "considerable merit" to the idea that a suit's reactive nature may justify abstention. <u>Moses H. Cone Memorial Hospital</u>, 460 U.S. at 17 n. 20. Reactive suits increase litigation costs and burden courts. <u>See</u> <u>Skeete v. Moon</u>, No. 5:09-CV-326, 2009 WL 2611317, at *6 (M.D. Ga. Aug. 20, 2009). Abstaining in this case is necessary to avoid encouraging the filing of duplicative litigation in federal court in response to a state court's adverse summary judgment

---

[6] Bristol Heights has repeatedly emphasized that it is a defendant in the state court action, which it claims was filed preemptively for tactical advantage. I agree that if Bristol Heights had chosen the state forum the case for abstention under <u>Colorado River</u> would be even stronger. <u>See</u> <u>The Cadle Company</u>, 173 F.3d at *2. That Bristol Heights did not do so is insufficient to alter the outcome of the abstention analysis, however. Bristol Heights was content to remain in state court for nearly three years. It came to this forum only after suffering an adverse summary judgment ruling and did so in an attempt to secure a favorable disposition of the same claims.

8

**Exhibit E**

ruling on state law claims.

Bristol Heights submits that dismissing this action on the basis of <u>Colorado River</u> constitutes an abuse of discretion, especially since its bad faith and CUTPA claims have not been restored to the docket in state court. On the record before me, however, I cannot find that the procedures available in state court are inadequate to protect whatever interest Bristol Heights actually has in these claims.[7] Given the need to avoid encouraging the tactical maneuvering engaged in here, and the need to show appropriate deference to the state courts, I conclude that leaving Bristol Heights to its state court remedies is the only course consistent with principles of wise judicial administration.

III. <u>Conclusion</u>

The Clerk may enter judgment dismissing the action without prejudice to further proceedings in state court.

Dated this 29th day of March 2011.

_____/s/_____
Robert N. Chatigny
United States District Judge

_____

[7] These are the same claims Bristol Heights previously agreed to dismiss as part of its strategy to obtain a trial in this court on the breach of contract claim.

9

**Exhibit E**

D. Conn.
10-cv-154
Chatigny, J.

# United States Court of Appeals

### FOR THE
### SECOND CIRCUIT

———————————

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York, on the 27ᵗʰ day of December, two thousand eleven,

Present:

         Peter W. Hall,
         Debra Ann Livingston,
         Gerard E. Lynch,
            *Circuit Judges.*

———————————————————————

Bristol Heights Associates, LLC,

            *Plaintiff-Appellant*,

       v.                                      11-1115-cv

Chicago Title Insurance Company,

            *Defendant-Appellee.*

———————————————————————

Appellee, through counsel, moves to dismiss the appeal as moot. Upon due consideration, it is hereby ORDERED that the motion is GRANTED because the Connecticut Superior Court's August 18, 2011 final judgment in the parallel state court action precludes further proceedings in federal court based on the same factual assertions. *See O'Connor v. Pierson*, 568 F.3d 64, 69 (2d Cir. 2009) ("A federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered."); *Joe's Pizza, Inc. v. Aetna Life & Casualty Co.*, 236 Conn. 836, 871-72 (1996) (explaining that "[c]laim preclusion prevents the pursuit of any claims relating to the cause of action which were actually made or might have been made"); *Salem Park, Inc. v. Salem*, 149 Conn. 141, 144 (1961) (holding that trial court judgment is final for *res judicata* purposes notwithstanding a pending appeal).

                FOR THE COURT:
                Catherine O'Hagan Wolfe, Clerk



**Exhibit F**